**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | |
|---|---|
| DAVID L. ROBINSON,  ) | |
|   ) | |
|   Plaintiff,   ) | |
|   ) | |
| v.   ) | Case No. _____ |
|   ) | |
| CITY OF SIKESTON, MISSOURI,   ) | |
|   ) | |
|   Serve:  Jonathan J.A. Douglass   ) | |
|   City Manager   ) | |
|   105 E. Center Street   ) | |
|   Sikeston, MO  63801   ) | |
|   ) | |
|   and   ) | |
|   ) | |
| JOHN A. BLAKELY,   ) | JURY DEMANDED |
|   ) | |
|   115 Bradley Dr.   ) | |
|   Sikeston, MO  63801   ) | |
|   ) | |
|   and   ) | |
|   ) | |
| CHARLES ANDREW JUDEN III,   ) | |
|   ) | |
|   614 Laurelwood Ave.   ) | |
|   Sikeston, MO  63801   ) | |
|   ) | |
|   Defendants.   ) | |

**COMPLAINT**

Plaintiff David L. Robinson brings the following Complaint against Defendants City of
Sikeston, Missouri, John Blakely, and Charles Andrew Juden III:

**Parties and Jurisdiction**

1.      Plaintiff David L. Robinson ("Robinson") is an individual living in Scott County,

Missouri, who spent more than 17 years of his life incarcerated for the murder of Sheila Box—a

1

murder he did not commit—before he was exonerated by the Supreme Court of Missouri in 2018.

2.      Defendant City of Sikeston, Missouri is a city of the third class incorporated pursuant to Missouri statutes and the Missouri Constitution.  The Sikeston Department of Public Safety (hereinafter, the "Sikeston Police Department") is an arm of the City of Sikeston.

3.      Upon information and belief, Defendant John Blakely (hereinafter, "Detective Blakely" or "Blakely") is a resident of Scott County, Missouri.  At all times relevant to this Complaint, he was a detective in the Sikeston Police Department.  In his capacity as a detective of the Sikeston Police Department, he directed the investigation of the Box murder and caused Robinson to be arrested and wrongly charged with that murder.  Any actions, omissions, and conduct taken by Detective Blakely in his capacity as a detective of the Sikeston Police Department are part of the City of Sikeston's customs, policies, patterns, and practices, and are sufficient to impose liability on the City of Sikeston for those actions, omissions, and conduct.

4.      Upon information and belief, Defendant Charles Andrew Juden III ("Juden") is a resident of Scott County, Missouri.  At all times relevant to this Complaint, he was either a Captain in, or Chief of, the Sikeston Police Department.  In these roles, Juden was involved in and oversaw the investigation of the Box murder and supervised Detective Blakely.  Any actions, omissions, and conduct taken by Juden as Chief of the Sikeston Police Department are part of the City of Sikeston's customs, policies, patterns, and practices, and are sufficient to impose liability on the City of Sikeston for those actions, omissions, and conduct

5.      Jurisdiction is conferred by 28 U.S.C. § 1343 which provides for original jurisdiction of this Court in suits authorized under 42 U.S.C. § 1983 to redress the deprivation (under color of state law, statute, ordinance, regulation, custom, or usage) of any right, privilege,

or immunity secured by the Constitution of the United States or by any act of Congress providing for equal rights of citizens or other persons within the jurisdiction of the United States.

6.      Venue is proper in this District Court because Plaintiff and all Defendants reside in this District and the actionable conduct occurred in this District.

## Factual Allegations

7.      On the night of August 5, 2000, Sheila Box was shot in the chest while she was the sole occupant and operator of a GMC Suburban in Sikeston, Missouri.  After being shot, Box drove her vehicle until she lost control and left the roadway of Malone Avenue to the east of its intersection with Branum Avenue.  The vehicle crashed through a fence and into a building which houses a local flea market known as "the Tradewinds."

8.      Police and other first responders were summoned to the scene and found Box in her vehicle with a handgun in her lap.  That gun was not the murder weapon.  Twenty or forty dollars in cash was found on the seat or floorboard of the Suburban.  Although Box was conscious when first responders arrived, she could not identify her killer and died shortly afterward at the hospital.

9.      That same night, an unidentified informant for the Sikeston Police Department reported that that he had "heard," and not seen, that David Robinson and Keith West were involved in the killing near the corner of Washington and Westgate Streets, which is to the north of Malone Avenue.  Based only on that unsubstantiated tip, Captain Juden arrested Robinson for the murder in the early hours of the morning of August 6, 2000.

10.     During the arrest, Captain Juden placed his gun on the side of Robinson's head and threatened to shoot him.  Detective Blakely also was present at the arrest and observed Captain Juden's threats.  Detective Blakely did not intervene.  Robinson denied any involvement

12546661.2

in the murder at the time and has always denied any involvement.  The Sikeston Police took Robinson to the local jail. Later that day on August 6 around noon, Sikeston police told Robinson that he was no longer being held for Box's murder.  However, the Sikeston Police continued to hold Robinson on an alleged parole violation. Three days later on August 9, 2000, the Sikeston Police released Robinson without charging him with Box's murder.

11.     No physical evidence ever connected Robinson to Box's murder.  A test for gunshot residue on August 6, 2000, the night of the murder, performed by the Sikeston Police on Robinson found no gunshot residue.  The Sikeston Police did not find Robinson's fingerprints at the crime scene.

12.     After Box's murder, Albert Baker, a crack addict, was arrested and jailed for felony stealing of an air conditioner.  Baker had signed up in June 2000 to be a paid informant for the Sikeston Police Department.  While Baker was in the Sikeston jail, Sgt. Susan Rockett of the Sikeston Police Department visited him.  Sgt. Rockett asked Baker whether he knew anything about the murder of Sheila Box.  Baker denied knowing anything about the murder.

13.     On August 15, 2000, Baker, after sitting in jail and being unable to post bond, told Sgt. Rockett he wanted to talk to Detective Blakely about Box's murder, and Sgt. Rockett so informed Detective Blakely.  Although Detective Blakely was the lead detective on Box's murder investigation, Blakely did not immediately go to see Baker.  Instead, Detective Blakely waited until about 1:00 a.m. on August 18, 2000, to awaken Baker in his jail cell and question him.

14.     As a result of the interview conducted by Detective Blakely in the dead of night, Baker ultimately signed a witness statement prepared by Detective Blakely claiming that Baker witnessed Robinson shoot Box.  In the statement prepared by Detective Blakely, Baker claimed

4

he witnessed the shooting from about five feet away as Robinson approach Box's parked vehicle at a pay phone in a convenience store parking lot at the northwest corner of Malone and Branum. In the statement prepared by Detective Blakely, Baker said Robinson fired a shot in the air as he approached the vehicle from across the street, fired a single shot through the driver's side window of the vehicle, and immediately sprinted away. In the statement prepared by Detective Blakely, Baker said Box's Suburban then exited the parking lot onto West Malone going east and crashed into the Tradewinds.  In the statement prepared by Detective Blakely, Baker provided no explanation as to why this statement was contrary to his initial statement given to Sgt. Rockett where he stated he had no information about the Box murder.

15.     The statement Detective Blakely prepared on Baker's behalf was false, and Detective Blakely knew it was false.  It was procured through Detective Blakely's intentional, late-night coaching of Baker to implicate Robinson in the murder.  Baker's account was contrary to the testimony of two trial witnesses: (1) Antonio Jones, who testified he observed Box's vehicle traveling north on Branum from the area of Ruth Street before turning onto Malone (rather than exiting the convenience store parking lot directly onto Malone), and (2) Lillian Collins, the owner of the convenience store, who testified she did not hear any gunshots shortly before the crash of Box's vehicle.  Both Jones and Collins were contemporaneous witnesses who had no motivation to lie about the direction that Box's vehicle traveled after she was shot and before she crashed into the Tradewinds.

16.     After obtaining Baker's signature, Detective Blakely arranged for Baker's immediate release from jail.  Although Baker had been unable to post bond for days, Baker was suddenly released on his own recognizance just hours after he gave Blakely his statement implicating Robinson.  Detective Blakely had contacted the Scott County Prosecutor's Office

5

directly about having Baker released because of the statement Baker had given him earlier that morning. As opposed to Jones and Collins, Baker immediately received a benefit for giving the Sikeston Police his statement.

17.     Detective Blakely also gave Baker, a crack addict, $50 in cash the morning of his release.  Blakely proceeded to give Baker additional cash payments of various amounts ranging between $10 and $100 on August 22, 23, and 29 and on September 2, 11, and 15.  Although Detective Blakely later claimed that those payments were made as support under the Witness Protection Program, the documentation kept by the Sikeston Police Department shows that Baker received the payments as a paid informant and not as a protected witness.

18.     Later, Detective Blakely also arranged for Baker to live in an apartment in Perryville, Missouri, at the expense of the Sikeston Police Department.  Baker eventually moved to Milwaukee, Wisconsin; and the payments from Blakely stopped.  In all, Detective Blakely arranged for Baker to receive several thousand dollars of consideration for providing the false statement against Robinson.

19.     Based on Baker's signed statement which Detective Blakely knew to be false, Detective Blakely applied for, and received, a warrant to arrest Robinson for the Box murder. Blakely arrested Robinson on August 30, 2000. Robinson was incarcerated in the Scott County Jail until his murder trial.  Robinson would not be released from confinement for more than 17 years.

20.     After Detective Blakely arrested Robinson, the detective obtained a second statement from a prisoner in the Scott County Jail named Jason Richison.  According to that statement, also prepared by Detective Blakely, Richison claimed he shared a cell with Robinson for three or four days, at which time and place he heard Robinson confess to the murder.

6

21.     Richison, however, had never shared a cell with Robinson.  Detective Blakely, Captain Juden, and the Sikeston Police Department knew this.  They also knew that Jason Richison was a paranoid schizophrenic who tried to kill himself in a Scott County Jail.  Despite this knowledge, Richison was endorsed as a witness at Robinson's trial to testify that he was in the same cell with Robinson and heard Robinson confess to the murder.  Detective Blakely, Captain Juden, and the Sikeston Police Department knew that Richison committed perjury when Richison falsely testified that he had shared a cell with Robinson.

22.     Prior to Robinson's trial in 2001, the Sikeston Police Department had obtained information from Scott County Deputy Sheriff Bobby Sullivan that Romanze Mosby was involved in the murder. Ultimately, Mosby proved to be the true killer.

23.     When confronted by the authorities, Romanze Mosby told the authorities that he believed it was Carlos Jones who murdered Sheila Box. Carlos Jones told the authorities that he that Romanze Mosby killed Sheila Box.  Notably, neither man accused Robinson of being involved.  When presented with this information, Detective Blakely did not attempt to follow up or speak with Mosby or conduct any other investigation into Mosby's involvement in the murder.

24.     At the time Detective Blakely refused to investigate Mosby's involvement in the Box murder, Detective Blakely had information that Romanze Mosby may have been involved in shooting five other people.  During the year that Robinson was awaiting trial—between August 2000 and August 2001, Blakely and other detectives were investigating Romanze Mosby and his brother Lewis for shootings that injured five people.  Ultimately, Mosby admitted to Blakely that he had killed at least one of the people and led the police to his 9mm handgun, the same type that was used to kill Sheila Box.  Even after Mosby confessed to murder, Detective Blakely refused

7

to investigate Mosby for Box's murder. Blakely did not have the gun that Mosby used to kill someone else tested to determine whether it was the gun that killed Box.

25.     Blakely, Juden, and the Sikeston Police zeroed in on David Robinson as the killer of Sheila Box.  Even though they had information pointing to Romanze Mosby as the actual killer, they did not follow up on that information and investigate whether Mosby was involved. Robinson admittedly had been a thorn in the sides of Blakely, Juden, and the Sikeston Police for many years, and they decided Robinson would be the one they would get for the Box murder.

26.     Prior to Robinson's murder trial and before the Sikeston police arrested Baker on charges of trying to steal an air conditioner, Baker was living in a trailer on property of a man named Ronald Coleman.  Coleman told the authorities that Baker was homeless and that he let Baker live on his property in exchange for work such as mowing the lawn and cleaning dog kennels.  During a phone call while Baker was in Milwaukee, Baker told Coleman that he never saw Robinson shoot Box.  Baker said that he made the statement about Robinson shooting Box because of the pending charges against him, the preferential treatment Detective Blakely was offering, and because Robinson had taken some money from him previously.  Coleman also said Baker told him that the Sikeston police offered him a deal.  If he testified against David Robinson, they would drop any charges against him and give him a ticket out of town.

27.     Coleman got word that Baker had given a statement to police concerning Coleman taking or selling drugs.  Prior to Robinson's trial, Coleman disclosed what Baker had told him about not seeing Robinson shoot Box to the Public Defender representing Robinson, who planned to have Coleman testify for Robinson at his trial.  Upon learning of Coleman's involvement, Detective Blakely obstructed Coleman's testimony. Detective Blakely called Coleman at his home before the trial and told Coleman that, if he showed up for trial, drug

charges would be filed against him and he would be arrested.  If Coleman did not show up for trial, Detective Blakely would see that any drug charges against Coleman would be dropped. After Blakely's obstruction and threat, Coleman did not show up for trial and did not respond to calls from the Public Defender's Office.

9

## Robinson's Trial

28.     Robinson's trial occurred on August 25-29, 2001.   No physical evidence connecting him to the crime was presented.   The only evidence implicating Robinson in the murder was the false testimony of Albert Baker and Jason Richison, both of whose testimony should have been suspect to the Sikeston Police Department, including to Detective Blakely and Chief Juden.

29.     Antonio Johnson testified at the trial that he had seen Box at a pay phone at a gas station a few blocks away from the Tradewinds at the intersection of the Southwest and Ruth Streets.   After getting his own gas, Johnson said he was driving west on Malone when Box almost crashed into his car.   He saw her Suburban swerve up Branum Avenue coming from the area of Ruth Street.   Then he watched Box turn onto Malone Avenue without stopping at the stop sign at the intersection of Branum and Malone.   He said that Box's vehicle almost collided with his car, and that he then watched her crash through the Tradewinds fence.   Johnson's testimony contradicted Baker, who stated that he saw Robinson shoot Box on the parking lot at the convenience store at Branum and Malone and saw her Suburban leave the parking lot by driving directly onto Malone before crashing into the Tradewinds.

30.     Lillian Collins also testified at Robinson's murder trial.   Along with her husband, she owned the convenience stores at the corner of Branum and Malone.   She testified that she was at that store at the time Sheila Box crashed into the Tradewinds.   She said that her store had a drive-through window from which it was possible to see the intersection of Branum and Malone but that she heard no gunshots.   Like Antonio Johnson's testimony, Lillian Collins' testimony directly contradicted the testimony of Albert Baker that he saw Robinson shoot Box on the parking lot in front of her store.

12546661.2

31.     In a pretrial conference prior to Robinson's murder trial, the State filed a motion *in limine* to exclude the testimony of Deputy Bobby Sullivan that Romanze Mosby admitted killing Sheila Box.  The prosecution also filed a motion *in limine* to exclude testimony from Romanze Mosby that Carlos Jones had confessed to killing Box.  Both motions were sustained.

32.     Romanze Mosby appeared at trial in response to a subpoena and testified in an offer of proof that his cousin, Carlos Jones, had admitted shooting Box.  The defense also made an offer of proof from a witness named Kerenzo Hill, who was incarcerated with Carlos Jones. According to Hill, Carlos Jones told Hill that Romanze Mosby committed the murder on Ruth Street.  Hill's testimony about the location of the shooting was consistent with the testimony of Antonio Johnson about the direction from which Box's vehicle was coming when he first saw it. Like Johnson and Collins, Hill directly contradicted Albert Baker's testimony about where the shooting took place.

33.     The jury convicted David Robinson of the murder of Sheila Box, and the jury's verdict was upheld on direct appeal.

**Motion for Post-Conviction Relief**

34.     Subsequent to Robinson's conviction, the Public Defender's Office continued to investigate the matter; and Robinson filed a post-conviction motion to vacate his conviction. Peron "Butch" Johnson, an investigator for the public defender, conducted the investigation.

35.     Before the post-conviction hearing, Butch Johnson visited Romanze Mosby in prison in Licking, Missouri.  Mosby confessed to killing Sheila Box to Johnson on audio tape. Mosby said he was in the area of his uncle's house at 845 Ruth Street on the night of August 5, 2000.  A white woman in a blue Suburban pulled up and asked if Mosby had any drugs for sale, and Mosby indicated that he did.  Mosby walked up to the Suburban and offered to throw the

drugs in the car if she would throw the money out.  He saw a flash, which he thought was a gun, and shot her, thinking she was going to shoot him.  Mosby then watched the Suburban travel down Ruth and turn onto Branum Street.

36.     Unlike Baker's, Mosby's confession was consistent with the testimony of Johnson, Collins, and Hill about the direction that Box's car traveled and directly contradicted Albert Baker's testimony about where the shooting took place.

37.     Butch Johnson also interviewed Romanze Mosby's cousin, Carlos Jones, who corroborated Mosby's account and contradicted the trial and post-conviction hearing testimony of Albert Baker.  Jones said Mosby admitted to shooting a white woman who was buying drugs from him on Ruth Street.

38.     After Johnson obtained Mosby's audiotaped statement, Johnson contacted Albert Baker at his home in Park Hills, Missouri.  Baker initially refused to speak with him.  Johnson returned to Baker's house unannounced on a later date and had a conversation with Baker on Baker's front porch.  In that conversation, Baker began to cry and asked Johnson to tell Robinson that he was sorry for what he had done.  Baker admitted to Johnson that he had not seen the murder and had falsely accused David Robinson in order to get out of jail.  Baker did not want to make a recorded statement at the time but agreed to look at the transcripts of the statements Johnson had obtained from other witnesses, including the confession of Romanze Mosby.  Johnson then obtained a subpoena and served it on Baker in order to secure Baker's attendance at the post-conviction relief hearing.

39.     Prior to the post-conviction relief hearing, Assistant Attorney General Elizabeth Bach was informed that Baker had made a statement to Butch Johnson that Baker had not actually seen the shooting and that Baker had perjured himself at Robinson's trial.  Upon

learning this information, Bach made a hand-written note in her file which said: "Told Blakely – have no contact with Albert!"  Her note suggests that she feared Detective Blakely would attempt to improperly influence Baker.

40.     Bach's fear came to fruition.   Upon learning that Baker had recanted his testimony, Detective Blakely contacted Baker. Blakely arranged for a uniformed officer in Park Hills, Missouri, to find Baker.  While Baker was walking down a street in Park Hills, the officer drove up to Baker and handed him a telephone with Blakely on the other end.  According to Baker's testimony at the habeas corpus hearing, Blakely told him, "We are watching you" in order to persuade Baker not to testify at the post-conviction hearing.  Baker testified in the hearing before Judge Missey that instead of telling the truth and recanting his previous false statements at the post-conviction hearing, he reverted back to his trial testimony because he felt threatened by what Detective Blakely said to him in the cell phone call.  Detective Blakely acknowledged at the same hearing that a telephone call like the one Baker described may have occurred, but he denied making such a statement.

41.     As Blakely had planned, Baker stopped communicating with Johnson and would not answer Johnson's phone calls.  Johnson then went to see Baker in person to provide Baker with a money order for trial expenses in connection with a subpoena Johnson had served for the post-conviction relief hearing.  At that meeting, Baker was distant and "standoffish," which caused Johnson to believe that Baker was prepared to revert to his original perjured testimony. After that meeting, Johnson attempted on several occasions to contact Baker, but Baker would not respond.  Johnson became frustrated and wrote an angry letter to Baker in which Johnson told Baker that he was only going to make things worse for himself by continuing to lie. In his letter, Johnson stated, "You did wrong at the original trial, don't do it again."  Baker shared this

letter with the prosecutor who shared it with opposing counsel and the judge at the post-conviction relief hearing.  The judge scolded Johnson for sending the letter; and Robinson's public defender chose not to call Johnson to testify that Baker had told him he did not see Robinson shoot Box.

42.     At a hearing on the post-conviction motion on November 5, 2004, Baker reverted to his trial testimony and stated that he, in fact, did witness Robinson shoot Sheila Box and did not recant his trial testimony in an interview with Butch Johnson.  Baker subsequently stated that he repeated this lie because of Blakely's threatening phone call.

43.     During the post-conviction proceedings, Robinson presented other evidence that Albert Baker had provided false testimony at Robinson's trial.

44.     Ronald Coleman testified in a deposition for the proceedings that in November 2000 Baker told Coleman that Baker had invented his story about seeing Robinson shoot Box to avoid charges and to get out of jail.  Coleman stated that Coleman did not testify at Robinson's trial because he believed he would be arrested on an unrelated charge if he entered the courtroom.  Coleman believed this because Detective Blakely called Coleman at his home before the trial and told Coleman that, if he showed up for trial, drug charges would be filed against him and he would be arrested.

45.     During the post-conviction proceedings, Jason Richison testified in a deposition that, like Baker and Coleman, he was threatened by the Sikeston Police before he gave his trial testimony and that, in fact, his testimony was untrue.  Richison admitted that he never heard David Robinson talking about killing Sheila Box.  At the time of his deposition, Richison was incarcerated in Wisconsin.  When he was served with the deposition subpoena, he spontaneously and voluntarily told the process server and the Sheriff's deputy who was present when he was

served that he falsely testified in a Missouri case against Robinson.  Richison said he was afraid to go back to Missouri and asked the deputy and the process server what he should do.  Both of them told Richison to tell the truth.  Both the process server and the deputy testified in depositions that Richison volunteered to them that he had testified falsely in Robinson's trial.

46.     Richison testified in the deposition that his trial testimony against Robinson was false and coerced by the police and that he had not heard Robinson confess that he shot Sheila Box.  He said that Detective Blakely had concocted the details of Richison's trial testimony, explaining that "they schooled me on what to say and how to say it."  He stated that the police threatened him and told him if he did not testify, they would charge him with drug possession and have him physically beaten up.

47.     During the post-conviction proceedings, Kevin King testified in a deposition that he was sitting in his own car on Westgate Street near its intersection with Malone and saw Box coming north on Branum Avenue from the area of Ruth and Laura Streets.  According to King, Box drove through the stop sign at Malone without stopping, turned right onto Malone, and almost crashed into Antonio Johnson's car.

48.     During the post-conviction proceedings, Ronnie Robinson (no relation) testified at the post-conviction hearing that he owned a detail shop and arcade on Branum between Malone and Ruth.  He said he watched the Suburban drive erratically north on Branum from the area of Ruth and pass his businesses before it ran the stop sign at the intersection of Branum and Malone and then turned right on Malone.

49.     The testimony of Antonio Johnson, Kevin King, and Ronnie Robinson aligned with the account given by Romanze Mosby that Mosby shot the victim at 845 Ruth and that she travelled west on Ruth and turned north on Branum.  The testimony also supported the accounts

15

12546661.2

of Johnson and Collins.  The testimony of Antonio Johnson, Kevin King, and Ronnie Robinson also irreconcilably conflicts with Baker's claim that he saw Robinson shoot Box while her car was stationary at a payphone on a parking lot at the corner of Branum and Malone.

50.     The court denied Robinson's motion for post-conviction relief.

## Habeas Corpus Proceedings

### *Further Investigation*

51.     In addition to giving the audio taped confession to Butch Johnson, Mosby confessed to several fellow inmates while he was in prison for an unrelated crime that he killed Sheila Box.  Butch Johnson obtained affidavits from each of these men.

52.     At South Central Correctional Center, Mosby would speak from time to time with Michael Richardson, an inmate who worked in the gym.  During one of those conversations in 2002, Mosby asked Richardson about Richardson's manslaughter conviction, in particular what facts are required to be convicted of manslaughter instead of murder.  When Richardson asked Mosby why he was so interested in the concept of manslaughter, Mosby told Richardson that Mosby had shot "the woman that David Robinson is locked up for."  Mosby explained that he shot Box in her car because he saw a gun between her legs and was afraid she would shoot him.

53.     Mosby also confessed to Vincent Hines when they shared a prison cell in 2005.  According to Hines, Hines was complaining to Mosby about being wrongfully convicted.  Mosby became upset and told Hines that Mosby was troubled because someone else had been convicted of a killing Mosby committed.  Mosby said that the shooting occurred during a drug deal.  He told Hines that Mosby pulled out his gun when he saw the woman had a gun and shot her before she could shoot him.

16

54.     Donald Triblett, who was incarcerated with Mosby at the South Central Correctional Center in Licking, MO, said Mosby told him that he, Mosby, had confessed to the public defender's investigator that "he was the person who shot the girl, and the other person they locked up for it wasn't the person."  Triblett noted that Mosby subsequently began to appear stressed and lost weight.

55.     Larry Patterson, who was incarcerated with Mosby at the Northeast Correctional Center in Bowling Green, MO, said Mosby told him he, Mosby, shot the woman David Robinson was convicted of murdering.

*Cole County Habeas Proceedings*

56.     David Robinson obtained a new team of attorneys through a legal clinic at the Washington University in St. Louis School of Law.  These lawyers filed a *habeas corpus* petition in Cole County Circuit Court.

57.     Robinson's new attorneys interviewed Albert Baker in 2012 while he was in prison. In a videotaped interview, Baker recanted his trial testimony and stated that he did not see Robinson shoot Sheila Box.  These attorneys took Albert Baker's deposition in the *habeas* proceedings on May 8, 2015.  Upon learning that Baker planned to recant his testimony, the State threatened Baker with perjury charges. Despite these threats, Baker confessed under oath that he had lied at Robinson's trial when he said he saw Robinson shoot Box.  He explained that he provided his false testimony because he was receiving money and housing from the State and feared retaliation from Detective Blakely.

58.     Robinson's attorneys also took the deposition of Kelvin Howard, Mosby's stepfather, on February 18, 2015.  Howard testified that he was in prison with Mosby on June 9, 2009, when they saw a newspaper article in the prison library that detailed Robinson's renewed

efforts to have his conviction overturned. The article included Mosby's confession to the murder. Howard said that, after reading the article, he and Mosby then went out to the prison yard. As they were walking in the yard, Mosby became very depressed and informed Howard that he had shot the woman Robinson was convicted of murdering. Mosby said that he was now afraid that he would be subpoenaed to testify and that the authorities would learn he was the real killer. He feared that he would be found guilty of murder and then spend the rest of his life in prison. At that time, Mosby had only two months remaining on his sentence. Mosby wanted the two of them to take a picture together and asked his stepfather to take care of his mother. Later that night, Mosby committed suicide by hanging himself in his cell.

59.     An evidentiary hearing on Robinson's habeas corpus petition was held in Cole County before Judge Daniel R. Green on May 14-15, 2015. During the hearing, Robinson presented the depositions of Kelvin Howard and Albert Baker. Robinson also introduced the deposition of Jason Richison taken for the evidentiary hearing on Robinson's motion for post-conviction relief while Richison was in prison in Wisconsin, in which he testified that David Robinson did not confess to him that he had shot Sheila Box and that he only gave this false testimony because of threats by Detective Blakely.

60.     Robinson also submitted the depositions of Kevin King and Ronnie Robinson. Kevin King testified that, while he was stopped at Westgate and Malone waiting to turn onto Malone, he saw Box's car coming from the direction of Ruth and Laura Streets north on Branum before turning into Malone. Ronnie Robinson testified that he watched the Suburban driving north on Branum Avenue past his business at the corner of Laurel and Branum from the area of Ruth Street before it ran the stop sign at the intersection of Branum and Malone and turned right onto Malone Avenue, where it nearly collided with Antonio Johnson's car. Robinson submitted

the trial testimony of Antonio Johnson, in which Johnson said he saw Box's Suburban coming up Branum from the direction of Ruth. Johnson said he watched Box turn right onto Malone without stopping at the stop sign at Branum and Malone, almost collide with his car, and crash through the Tradewinds Flea Market fence. Taken together, the testimony of these three men corroborated the Albert Baker's recantation of his trial testimony that he saw Box's car coming out of the convenience store parking lot at the corner of Branum and Malone directly onto Malone.

61.     Robinson submitted the depositions of Michael Richardson and Donald Triblett and the affidavits of Vincent Hines and Larry Patterson. All of these witnesses were Romanze Mosby's fellow inmates who stated under oath that Mosby had admitted to killing Box.

62.     Robinson also testified at the habeas corpus hearing in Cole County. He said that he did not kill Sheila Box. He further testified that he had never spoken to Jason Richison about killing Sheila Box.

63.     Robinson also called Butch Johnson, who testified that he had obtained the recantation of Albert Baker and the audiotaped confession of Romanze Mosby.

64.     This 2015 habeas corpus hearing was the first time a court heard the truth from Albert Baker and Jason Richison. Despite the sworn recantations of Baker and Richison and the other evidence corroborating their accounts, the court denied Robinson habeas relief, adopting the State's proposed findings and conclusions nearly verbatim.

12546661.2

*Further Habeas Corpus Proceedings*

65.     After Judge Green's ruling, Robinson filed a habeas corpus petition in the Missouri Court of Appeals for the Western District (Kansas City).  That court simply denied the petition, without any opinion, a few days after it was filed.

66.     Robinson followed up by filing a new habeas corpus petition with the Missouri Supreme Court, which granted a preliminary writ of habeas corpus in favor of Robinson and appointed Circuit Judge Darrell Missey of Jefferson County, Missouri, as a Special Master to hear evidence and make findings and conclusions.

67.     Judge Missey conducted an evidentiary hearing at which 16 witnesses appeared and testified over the course of seven hearing days.  Most of Robinson's witnesses from the Cole County hearing who had testified by deposition, prior transcript, or affidavit testified live: Albert Baker, Kelvin Howard, Antonio Johnson, Kevin King, Ronnie Robinson, Michael Richardson, Vincent Hines, and Donald Triblett.  Michael Richison appeared live by video conference but refused to testify on Fifth Amendment grounds.  Carlos Jones testified live that he saw his cousin, Romanze Mosby, shoot Sheila Box in the 800 block of Ruth Street.  This was contrary to his prior statements that he could not identify the shooter because it was too dark but that Mosby told him later that he did it.  Judge Missey found Jones' testimony that he saw Mosby shoot Box to be credible and attributed Jones' prior statement to an attempt to distance himself from any involvement in the shooting.   Butch Johnson testified to the same topics covered in his appearance in Cole County.  Finally, David Robinson again testified live, gave an account of his whereabouts the night of the murder, and denied that he shot Box.  The State presented the live testimony of Elizabeth Bock, the prosecutor in Robinson's case, now an associate circuit judge in

the 44th Judicial Circuit, and Detective Blakely.  The State also presented testimony of various police officers whose names had been mentioned in the course of the hearing.

68.     Judge Missey issued a 92-page report, finding and concluding that David Robinson was innocent of the murder of Sheila Box and detailing multiple constitutional violations that resulted in Robinson's wrongful arrest, prosecution, and incarceration.

69.     On May 1, 2018, the Missouri Supreme Court issued an order stating that having reviewed the record and the amended and final report of the Master, the Court concluded that David Robinson has met the burden of proof necessary to establish his "gateway" claim of innocence and in light of the constitutional violations that occurred during his trial, he is, therefore, entitled to habeas corpus relief.  The State of Missouri elected not to retry Robinson for the offenses for which he was convicted, and Robinson left prison on May 14, 2018.

70.     After hearing Detective Blakely's testimony, and after reading his testimony at the murder trial, Judge Missey found that Blakely was not credible based on both the substance of his testimony and his demeanor while delivering it. Judge Missey found that much of Blakely's testimony was not true.

71.     Judge Missey did not believe Blakely's account of his initial contact with Albert Baker, pointing out no competent detective is going to accidentally wait two days to interview a witness to a homicide and then decide to do it in the middle of the night.  Judge Missey found it more likely that Blakely intentionally delayed the interview, noting that a person who has been in jail for a period of time and has been awakened in the middle of the night would have greater incentive to make statements that may lead to his release.

72.     Judge Missey found that Blakely's testimony that he had nothing to do with the release of Albert Baker immediately following the early morning interview was false.  Judge

Missey found that the testimony was inconsistent with Blakely's own testimony at Robinson's trial that Blakely contacted the Scott County Prosecutor, Christy Baker-Neal, about Baker's statement given to Blakely while sitting in jail in the early morning hours of August 18, 2000 that he saw Robinson shoot Box. In fact, Blakely sent Ms. Baker-Neal a copy of Baker's statement and told her to let Blakely know if she wanted anything else before Baker was released.

73.     Judge Missey did not believe Blakely's testimony that all the payments Blakely made to Albert Baker were witness protection payments rather than informant payments. Judge Missey noted that Blakely was confronted with numerous documents showing that Baker received money as a paid informant, not as part of a witness protection program. Judge Missey also noted that some of those documents are dated before Albert Baker's name became public and there was any reason for placing Baker in a witness protection program. At the time the payments were made, Baker remained in Sikeston and was not in hiding. Some of the documents indicated that the payment was "for information," not, as Blakely claimed at the hearing before Judge Missey, for rent or food.

74.     Judge Missey did not believe Blakely's explanation of how Blakely happened to learn about Richison—that someone from the jail called to tell Blakely that Richison wanted to talk to him about the Robinson case. Judge Missey noted it was more likely that Blakely began to make inquiry of prisoners who were in jail in order to find someone who would say that David Robinson was making incriminating statements. This explanation would be consistent with Blakely's testimony that he had obtained two other statements from prisoners which were not used at trial. Judge Missey believed that Blakely most likely initiated contact with Richison, not the other way around.

75.     Judge Missey found that Blakely knew Jason Richison's testimony that Richison was in the same cell with David Robinson was false, but Blakely presented as true Richison's claim that he heard Robinson admit the murder while they were in that cell together and allowed Richison to perjure himself at Robinson's trial.  Judge Missey noted Blakely admitted that he knew the identity of Robinson's real cellmates, but claims he never contacted them to find out if Robinson had actually made the incriminating statements that Richison described.  Judge Missey concluded it is more likely that Blakely either talked with the cell mates and did not like what they had to say or decided not to speak with them for fear they would undermine the false story he obtained from Richison.

76.     Judge Missey also noted the trial transcript reveals that Elizabeth Bock told the trial judge in a pre-trial conference that she instructed the Sikeston Police not to interview Romanze Mosby.  Judge Missey pointed out that this was a fact Blakely conveniently did not share with him when he was asked why he had not interviewed Romanze Mosby.

77.     In his report, Judge Missey described testimony from Albert Baker about a phone call Baker received from Blakely before the hearing on the motion for post-conviction relief.  As Baker was walking down a street in Park Hills, he was confronted by a uniformed officer who handed him a phone with Blakely on the other end.  According to Baker, Blakely told him, "We are keeping an eye on you."  Baker testified this call, with its implied threat, was the reason he restated his original perjured testimony at the hearing and denied that he had recanted that testimony to Butch Johnson.

78.     The evidence revealed a clear pattern of misconduct by Detective Blakely in which he brought forward unreliable evidence that falsely pointed toward David Robinson as Box's killer and ignored and suppressed facts which pointed away from him and pointed to the

real killer.  Rather than gather all the evidence and follow where it may lead, Blakely reached the conclusion that David Robinson should go to prison for the murder of Sheila Box and assembled and concocted facts which would support the conclusion while disregarding all other evidence.

79.     Judge Missey found that the arrest and conviction of David Robinson turned on the statement and trial testimony of Albert Baker, who recanted that testimony convincingly before Judge Missey.  Judge Missey found that Baker had good reason to lie at Robinson's trial. Judge Missey found that by giving Blakely the statement Blakely wanted, Baker won his freedom.  Baker also received cash he could use to sustain his drug habit.  Blakely had promised "change (Baker's) life" and place him in a witness protection program and continued to pay him. Blakely continued to intimidate Baker so that Baker would not truthfully testify in the subsequent proceedings.

80.     Judge Missey concluded that the testimony of Jason Richison used to convict David Robinson was false and that Richison had fabricated that he had heard Robinson admit the murder.  The testimony of Richison was a lie, and Blakely knew it was a lie.  Nevertheless, Blakely allowed Richison to perjure himself to wrongfully convict Robinson.

81.     Judge Missey determined that the underwhelming nature of the inculpatory evidence in Robinson's murder trial, together with the credible recantations of Albert Baker and Jason Richison "make a clear and convincing showing of actual innocence that undermines confidence and the correctness of the judgment" and that the continued imprisonment of Robinson is "manifestly unjust."   He recommended to the Missouri Supreme Court that Robinson's conviction should be set aside, and the Supreme Court agreed with that recommendation.

82.     Judge Missey also found that the confession of Romanze Mosby is credible and compelling and establishes that David Robinson did not kill Sheila Box.  Mosby confessed to at least five people that he killed Box.  Blakely knew of these statements and steadfastly refused to investigate them. Each time one of these confessions was presented to a court, the prosecutors objected that the testimony was hearsay.   Judge Missey concluded that Mosby's multiple confessions were admissible because they were declarations against interest: (1) the declarant is unavailable as a witness, (2) the declaration, when made, related to a fact against the apparent pecuniary, proprietary or penal interest of the declarant, (3) the declaration concerns a fact personally cognizable by the declarant, and (4) the declaration is made under circumstances which render it improbable that a motive to falsify exists.  Mosby is clearly unavailable; he is dead.  Mosby's repeated statements that he killed Sheila Box were obviously against his penal interest.  The fact that Mosby shot Sheila Box is certainly cognizable to him.  No reasonable motive existed for Mosby to make false statements that he killed Sheila Box, for only the possibility of severe punishment awaited him as a result of those statements.

83.     As Judge Missey noted, the taped confession of Romanze Mosby makes perfect sense and explains many previously unexplained facts.  Mosby's account of a "drug deal gone bad" is extremely plausible.  His confession provides context and motive for the shooting which did not previously exist.  His statements regarding the location of the event explains why multiple witnesses saw Sheila Box's vehicle travelling erratically up Branum Avenue.  His confession provides a connection between the shooting and the gun in Sheila Box's lap.  Yet, Blakely did not pursue the obvious and clear evidence pointing to Mosby.  Blakely made inconsistent excuses for not doing so in the habeas corpus hearing—that he thought someone else was investigating the leads or that he did not know about the evidence until after Robinson was

25

convicted.  Neither excuse makes sense.  Blakely ran the investigation and would have known who was doing what; and he was involved in investigating Mosby for other murders at the same time.   In addition, records show Scott County Detective Sullivan informed Blakely about evidence implicating Mosby prior to Robinson's trial.

84.     The Sikeston Police Department, including Detective Blakely and Chief Juden, possessed information that exonerated David Robinson and showed that Robinson did not shoot Sheila Box.    Several witnesses already had come forward before Robinson's trial with information that contradicted Baker's initial statement to Blakely that Baker had seen Robinson shoot Box on the convenience store parking lot at Branum and Malone.  The Sikeston Police Department, Blakely, and Juden constructed a case to convict Robinson and get Robinson off the streets because they did not like him, even though they possessed information that Robinson did not kill Sheila Box.  As more witnesses came forward after Robinson's conviction to testify at the post-conviction hearing to facts that contradicted Baker's testimony, these defendants continued to ignore the mounting evidence of Robinson's innocence and intentionally prevented the truth from coming to light.  Indeed, they intimidated Baker into denying at the post-conviction hearing what he had admitted to Butch Johnson, that he did not see Robinson commit the murder.  They ignored Jason Richison's deposition testimony for that hearing recanting his claim that Robinson admitted the killing to him.  They played an integral role in preventing Robinson's wrongful conviction from being overturned in 2004 and again in Cole County in 2015 and causing him to continue to be incarcerated for an additional 13 years.

85.     Judge Missey found that Robinson has proven by clear and convincing evidence that he is actually innocent of the murder of Sheila Box.  The only two witnesses at trial against David Robinson were Albert Baker and Jason Richison, both of whom have since recanted their

26

trial testimony.  Additionally, the exculpatory evidence consisting of the confession of the actual killer is convincing evidence.  Romanze Mosby killed Sheila Box.  The Court found that no reasonable juror would convict Robinson in light of the new evidence of the recantations of Albert Baker and Jason Richison and the evidence that Sheila Box was shot on Ruth Street by Romanze Mosby.  Robinson's conviction resulted from the knowing presentation of false evidence at trial, the procurement and presentation of which violated Robinson's due process rights under the Constitution of the United States and the Missouri Constitution.

86.     The Sikeston Police knew that Jason Richison gave false testimony about being Robinson's cell mate.  That supposedly shared cell was the setting and opportunity for Jason Richison to have allegedly heard Robinson's critical admission that he shot Box.  Being cellmates increased the credibility of Richison's claim he heard that admission to the jury, but the Defendants failed to take any steps to correct his false testimony.

87.     The investigation that led to the conviction of David Robinson produced witnesses the Defendants knew or should have known falsely testified against Robinson.  The Defendants also failed to follow up on information that Mosby rather than Robinson killed Box. This conduct reflected an unconstitutional custom, policy, pattern, and practice in the Sikeston Police Department of reckless investigation that was prevalent around the time of Robinson's arrest and conviction.  These unconstitutional acts resulted in the wrongful arrest and conviction of David Robinson.

88.     As a result of his wrongful arrest and conviction and the wrongful conduct of the City of Sikeston, Chief Juden and Detective Blakely, Robinson has been deprived of his liberty and freedom and loss of income for more than 17 years and has suffered grievous emotional and physical injury while in prison and other grievous damages.

## Federal Claims

## Count I

## Claims under 42 U.S.C. § 1983 for wrongful arrest and for procurement and promotion of unreliable and false evidence.

89.     Plaintiff hereby incorporates each of the allegations of this Complaint set out above as if fully set forth herein and further allege as follows:

90.     Jason Richison and Albert Baker were the only two witnesses who testified in any material way against Robinson.  Defendants caused plaintiff Robinson to be arrested and charged with the murder of Sheila Box on the basis of information from these witnesses that Defendants knew was unreliable and false, or were reckless or acted with callous indifference in not knowing that the information was unreliable and false.  Detective Blakely supported and bolstered the charges against Robinson by procuring additional unreliable and false evidence after Robinson was charged and by endorsing unreliable and false evidence with his own testimony in the case against Robinson.

91.     Defendants knew or were reckless in not knowing that Albert Baker's claim he saw Robinson shoot Box on the convenience store parking lot at the corner of Branum and Malone was false.  Baker's claim was contradicted before and at Robinson's trial by Antonio Johnson and Lillian Collins.  Antonio Johnson testified he saw Box's vehicle coming from an entirely different direction and Lillian Collins testified she was at the convenience store at the time but heard no shots.

92.     Defendants suppressed exculpatory evidence the defense planned to use at trial that would have contradicted the false testimony of Albert Baker.  Detective Blakely threatened and intimidated Ronald Coleman so he would not appear in court to testify at Robinson's murder

12546661.2

trial, knowing Coleman would testify that Baker admitted he did not see Robinson shoot Box, thereby depriving Robinson of his right not to be deprived of liberty without due process of law.

93.     Defendants ignored evidence that Romanze Mosby, not Robinson, committed the murder of Sheila Box and intentionally or with reckless disregard or callous indifference failed to investigate Mosby as the likely killer.  Their actions were in bad faith and violated Robinson's due process rights.

94.     Defendants knowingly endorsed false testimony from Jason Richison that, while in the same cell with David Robinson, he heard Robinson admit murdering Sheila Box. Defendants endorsed such testimony knowing Richison had never shared a cell with Robinson. Rather than being suspicious of Richison's entire testimony because of his false claim about being cellmates, Defendants hid the correct information from the jury and, thereby, increased the chances the jury would find Robinson guilty.  Defendants' conduct of endorsing the false testimony of Richison was done in bad faith, and they acted recklessly or with callous indifference, all the while knowing or being reckless in not knowing Richison's testimony was unreliable and false.

95.     Defendants acted intentionally and recklessly and with callous indifference in continuing to endorse the testimony of Albert Baker after the trial as additional witnesses came forward in the post-conviction hearing, in particular Kevin King and Ronnie Robinson, to contradict Baker's testimony about where Box was shot.

96.     Detective Blakely intimidated Albert Baker and caused Baker not to testify for the defense at Robinson's post-conviction hearing in 2004 by telling Baker in a telephone call that, "We are watching you."  Blakely did this knowing that Baker had agreed to recant his testimony at Robinson's trial that he saw Robinson shoot Box.  Then, Blakely falsely testified at the 2004

hearing that he did not promise anything to Baker to testify against Robinson and that the only money Baker received would have come from the witness protection program.

97.    Detective Blakely falsely denied that he had threatened Ronald Coleman to persuade Coleman not to appear in Robinson's defense at his trial.

98.    Detective Blakely falsely testified that he did not look into Romanze Mosby's involvement in the murder because Mosby's name did not come up until after Robinson's conviction.

99.    Defendants acted intentionally and recklessly and with callous indifference in continuing to endorse the testimony of Jason Richison after he recanted his claim Robinson admitted shooting Box in the post-conviction proceedings.

100.    Although Defendants knew or with reasonable investigation could have discovered the foregoing information, they ignored it because it would have been inconsistent with their plan to get Robinson off the streets of Sikeston by wrongfully convicting him of Sheila Box's murder.  These acts and omissions were reckless and exercised with callous indifference and were deliberate and were done in bad faith, all in violation of Robinson's federal protected rights.

101.    The foregoing acts and omissions of Defendants were perpetrated while they were acting in their official capacities as officers in the Sikeston Police Department and under color of state law.  These acts and omissions violated clearly established rights to due process of law under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, which a reasonable person in Defendants' position would have known.  Such acts and omissions constituted violations of 42 USC § 1983.  The City of Sikeston is liable for the acts and omissions of Defendants Blakely and Juden described above in this Complaint because Blakely

and Juden were acting in their official capacities as officers of the Sikeston Police Department. The foregoing acts and omissions of Defendants were the proximate cause of Robinson being arrested, charged, and convicted of the murder of Sheila Box and being incarcerated for more than 17 years.

102.    Defendant's conduct described above, including without limitation, the wrongful arrest, charging, and conviction of Robinson proximately and directly caused him to suffer grievous and permanent injury and damage, which includes, counting the time he was awaiting trial in jail, 17 years of incarceration and the attendant humiliation, loss of freedom, companionship, family, educational opportunity and income, damage to his personal reputation, the infliction of mental and physical pain and suffering, the fear of bodily harm and death, and the anguish and despair caused by being incarcerated with a life-without-parole sentence for a crime he did not commit.

103.    The foregoing acts and omissions of Defendants were deliberate, reckless, wanton, motivated by evil motive or intent, done in bad faith and/or involve callous indifference to Robinson's federally protected rights and therefore justify an award of punitive damages.

## Count II

### Plaintiff's Claim Under 42 USC § 1983 For First And Fourth Amendment Violations of Rights of Access to Courts in Executive Clemency.

104.    Plaintiff hereby incorporates each of the allegations of this Complaint set out above as if fully set forth herein and further allege as follows:

105.    Having secured Robinson's wrongful incarceration through presentation of false testimony, suppression of exculpatory evidence, and fabrication of evidence, Defendants had a clearly established affirmative obligation to come forward with the truth during each year that Robinson was wrongfully detained.   Instead, Defendants intentionally, or with reckless

31

indifference and callous disregard of his federally protected rights, did not disclose their misconduct and Robinson's innocence, and continued to suppress the truth up until Robinson's exoneration in May 2018.

106.    Defendants' actions directly caused the wrongful conviction and imprisonment of Robinson and the repeated denials of his post-conviction request for relief as well as numerous other damages and physical, emotional and bodily injuries as set forth above.

107.    The foregoing acts and omissions of Defendants were deliberate, reckless, wanton, motivated by evil motive or intent, done in bad faith and/or involve callous indifference to Robinson's federally protected rights and therefore justify an award of punitive damages.

## Count III

## Plaintiff Robinson's 42 USC § 1983 Civil Rights Conspiracy Claim

108.    Plaintiff hereby incorporates each of the allegations of this Complaint set out above as if fully set forth herein and further alleges as follows:

109.    The individual Defendants Blakely and Juden and others yet unknown agreed among themselves and others to act in concert to deprive Robinson of his clearly established constitutional rights as protected by the Fifth and Fourteenth amendments, including his right not to be deprived of liberty without due process of law.

110.    Defendants engaged in and facilitated numerous overt acts in furtherance of such conspiracy, including but not limited to the following:

      a.  Acting in concert to obtain the false statement of Baker against Robinson and endorsing such testimony even though other witnesses' testimony contradicted Baker's account;

      b.  Acting in concert to endorse and present the false testimony of Jason Richison;

c.  Acting in concert to not investigate Mosby, the actual killer of Sheila Box, for the purpose of convicting Robinson even though they had information that Robinson was not the murderer;

d.  Acting in concert to suppress evidence that Baker did not see Robinson shoot Box;

e.  Prior and subsequent to Robinson's arrest, charging and conviction, deliberately ignoring and/or recklessly failing to investigate leads pointing to Mosby and proving Robinson's innocence.

111.   As a direct and proximate result of Defendants' overt acts, Robinson was deprived of his constitutional rights, wrongfully prosecuted, detained, and incarcerated for more than 17 years and subjected to grievous injuries and damages as set forth above.

112.   The foregoing acts and omissions of Defendants were deliberate, reckless, wanton, motivated by evil motive or intent, done in bad faith and/or involve callous indifference to Robinson's federally protected rights and therefore justify an award of punitive damages.

**Count IV**

**Plaintiff Robinson's 42 U.S.C. § 1983 *Monell* Claim for Deprivation of Liberty Without Due Process of Law Under the 14th Amendment**

113.   Plaintiff hereby incorporates each of the allegations set out above of this Complaint as if fully set forth herein and further alleges as follows:

114.   In addition to the individual Defendants Blakely and Juden, the City of Sikeston at all relevant times was responsible for its policies, practices and customs of its Police Department.

115.   The misconduct described above was undertaken pursuant to policies, practices, and/or customs of the City of Sikeston and Sikeston Police Department, which included but were by no means limited to:

    a.   Arresting, investigating, and prosecuting individuals that were innocent of the crime charged through flawed investigations;

    b.   Fabricating evidence, including, but not limited to, witness statements to bolster false prosecutions;

    c.   Failing to document and disclose witness statements, material exculpatory and impeachment evidence to prosecutors, defense counsel and the Court.

    d.   Failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigations; and

    e.   Engaging in the affirmative concealment and cover-up of this type of misconduct from the time of Robinson's arrest through his exoneration.

116.   Prior to and at the time of the unlawful investigation, prosecution and incarceration of Robinson, the Sikeston Police Department maintained a policy, custom, pattern, and practice of failing to properly supervise and train its officers with respect to fundamental and investigative techniques and duties, including techniques with respect to proper interrogations, the duty to avoid coaching witnesses, the duty to disclose manipulation of witnesses' recollection, and exculpatory evidence to prosecutors and defense counsel, proper methods of procuring and testing evidence, and proper methods of locating suspects and following up on leads.

117.   Prior to and at the time of the unlawful investigation, prosecution and incarceration of David Robinson, and continuing through at least 2018, the Sikeston Police

Department, by and through its policymakers, maintained a policy, custom, pattern, and practice for failing to supervise and discipline corruption and intentional misconduct committed by officers in the course of criminal investigations.

118.    The above-described practices were allowed to exist because policymakers with authority over the same exhibited deliberate indifference to the likelihood that wrongful incarceration would result therefrom.

119.    This deliberate indifference resulted in wrongful convictions and exonerations.

120.    The Sikeston Police Department's policy, custom, patterns, and practices were a moving force behind the denial of due process to Robinson in that they directly caused police improprieties and errors in the investigation, including manipulating witnesses' recollections, failing to follow up on exculpatory investigative leads and evidence and failing to report exculpatory material to prosecutors and defense counsel.  This unconstitutional policy, custom, pattern, and practice of the Sikeston Policy Department also delayed Robinson's exoneration.

121.    As a direct and proximate result of the Sikeston Police Department's policy, custom, patterns, and practices, Robinson was wrongfully prosecuted and continued to be detained for more than 17 years and suffered the other grievous and continuing injuries and damages as set forth above.

## MISSOURI STATE LAW CLAIMS

### Count V

### Plaintiff Robinson's Missouri State Law Claim for False Arrest

122.    Plaintiff hereby incorporates each of the allegations set out above of this Complaint as if fully set forth herein and further alleges as follows:

123.    Defendants did intentionally, willfully, unlawfully, maliciously, and without probable cause or legal justification cause Robinson against his will to be confined for the murder of Sheila Box.

124.    Defendants first arrested Robinson without legal justification but then within days released him.  They then obtained a statement from Albert Baker, which they knew or should have known was suspect and unreliable and for which they paid Baker in cash, and at approximately the same time they also had information that Romanze Mosby, rather than Robinson, had murdered Sheila Box, but did not investigate or follow up on that information. Defendants nonetheless arrested, detained and caused the conviction of Robinson.  Defendants subsequently learned that Baker's testimony was inconsistent with and contradicted by other disinterested witnesses and that Baker had admitted to Ronnie Coleman and others that he did not see Robinson shoot Sheila Box.  Nevertheless, Defendants suppressed that information, particularly with respect to the material information provided by Coleman, by threatening and intimidating him not to testify at the murder trial.  This suppression of evidence prolonged and continued Robinson's incarceration.

125.    Defendants engaged in this course of conduct without concern for or consideration of Robinson's perceived guilt or innocence, and for no purpose related to any legitimate prosecutorial concerns.

126.    As a direct and approximate result of Robinson's false arrest, he was wrongfully detained and incarcerated and served more than 17 years for a crime he did not commit and suffered the physical, emotional and pecuniary damages as described above.

## Count VI

## Plaintiff David Robinson's Missouri State Law Claim for Malicious Prosecution

127.    Plaintiff hereby incorporates each of the allegations set out above of this Complaint as if fully set forth herein, and further alleges as follows:

128.    Defendants, acting separately and in concert individually and in their official capacities did willfully, unlawfully, maliciously, and without reasonable grounds, probable cause or legal justification caused Robinson to be prosecuted, detained, and incarcerated for the murder of Sheila Box.

129.    Based upon Robinson's lack of knowledge of the crime and ample exculpatory evidence, defendants knew or should have known that Robinson was innocent.  Nevertheless, without reliable probable cause and reasonable grounds, Defendants caused the commencement of prosecution proceeding against Robinson.  Defendants' conduct was actuated without any proper motive and with malice because defendants knew or should have known that Robinson was not the actual perpetrator of the crime.

130.    Seventeen years after Defendants maliciously caused the commencement of a false and wrongful prosecution against Robinson, the Missouri Supreme Court exonerated Robinson and vacated his wrongful conviction holding that Robinson has met the burden of proof necessary to establish his "gateway" claim of innocence, and in light of the constitutional violation that occurred during his trial and he is, therefore, entitled to habeas corpus relief.

131.    As a direct and proximate result of Defendants' malicious prosecution of Robinson, Robinson was wrongfully detained and incarcerated and served more than 17 years for a crime he did not commit and suffered the physical emotional and pecuniary damages as described above.

12546661.2

<u>**Count VII**</u>

<u>**Plaintiff David Robinson's Missouri State Law Claim for Abuse of Process**</u>

132.    Plaintiff hereby incorporates each of the allegations set out above of this Complaint as if fully set forth herein, and further alleges as follows:

133.    Defendants, acting separately and in concert, individually and in their official capacities, made an illegal, improper, and perverted use of process, namely the arrest, investigation, charging, and prosecution of Robinson for a crime he did not commit.

134.    Defendants knew that the use of such process was neither warranted nor authorized because they knew, or had reason to know, that Robinson was innocent.

135.    As a direct and proximate result of Defendant's abuse of process, Robinson was wrongfully detained and incarcerated and served more than 17 years for a crime he did not commit, and suffered the physical, emotional and pecuniary damages as described above.

<u>**Count VIII**</u>

<u>**Plaintiff David Robinson's Missouri State Law Claim for Intentional Infliction of Emotional Distress**</u>

136.    Plaintiff hereby incorporates each of the allegations set forth above of this Complaint as if fully set forth herein, and further alleges as follows:

137.    Defendants, acting separately and in concert, individually and in their official capacities, did intentionally, maliciously, and with reckless disregard and deliberate indifference to Robinson's rights, engage in extreme and outrageous conduct in connection with the unlawful arrest, interrogation and prosecution of Robinson, including without limitation failing to investigate, fabricating evidence, presenting false testimony and suppressing exculpatory evidence.

138.    Defendants, knowing that Robinson was innocent of the crime and having evidence that another person committed the crime and intentionally failing to investigate that other person, acted so as to cause Robinson extreme emotional distress, and in fact did cause Robinson's severe emotional distress that resulted in bodily harm.

139.    Defendants' conduct was so outrageous in character, and so extreme in degree, as to go beyond all reasonable bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

140.    As a result of defendants' joint and several extreme and outrageous behavior, Robinson was wrongfully detained and incarcerated and served more than 17 years and suffered severe emotional distress and other damages and injuries described above for which he is entitled to damages.

## Count IX

### Plaintiff David Robinson's Missouri State Law Claim for Negligent Infliction of Emotional Distress

141.    Plaintiff hereby incorporates each of the allegations set forth above of this Complaint as if fully set forth herein, and further alleges as follows:

142.    Defendants, acting separately and in concert, individually and in their official capacities, realized or should have realized that their conduct involved an unreasonable risk of causing distress to Robinson.  As a direct and proximate result of Defendants' joint and several unreasonable behavior, Robinson suffered emotional distress from mental injury as is medically diagnosable and sufficiently severe to be medically significant, for which he is entitled to damages.

12546661.2

## Count X

## Plaintiff David Robinson's Missouri State Law Claim for Civil Conspiracy

143.    Plaintiff hereby incorporates each of the allegations set out above of this Complaint as if fully set forth herein, and further alleges as follows:

144.    Defendants and others persons yet unknown agreed among themselves and others to act in concert with the lawful objective of depriving Robinson of his constitutional rights as protected by the U.S. and Missouri Constitutions, including his right not to be deprived of liberty without due process of law.

145.    In furtherance of the conspiracy, Defendants engaged in and facilitated numerous acts and conduct in furtherance of the conspiracy, including but not limited to the following:

a.  Acting in concert to obtain the false statement of Baker against Robinson and in endorsing such testimony even though other witnesses' testimony contradicted Baker's account;

b.  Acting in concert to endorse and present the false testimony of Jason Richison;

c.  Acting in concert to not investigate Mosby, the actual killer of Sheila Box, for the purpose of convicting Robinson even though they had information that Robinson was not the murderer;

d.  Acting in concert to suppress evidence that Baker did not see Robinson shoot Box;

e.  Prior and subsequent to Robinson's arrest, charging and conviction, deliberately ignoring and/or reckless failing to investigate leads pointing to Mosby and proving Robinson's innocence;

12546661.2

f.  Acting in concert to threaten and intimidate Coleman from presenting exculpatory evidence at Robinson's trial, for the purpose of convicting Robinson even though defendants had information that Robinson was not the murderer.

146.   As a direct and proximate result of Defendants' overt acts, Robinson was deprived of his constitutional rights, wrongfully prosecuted, detained and incarcerated for more than 17 years and subjected to other grievous injuries and damages as set forth above.

WHEREFORE, Plaintiff Robinson respectfully requests

a.  A trial by jury of Robinson's claims;

b.  That the Court award compensatory damages to Robinson and against Defendants, jointly and severally, in an amount determined at trial;

c.  That the Court award punitive damages to Plaintiff and against Defendants in an amount to be determined at trial, in order to deter such conduct by Defendants in the future;

d.  For prejudgment and post-judgment interest, attorneys' fees and recovery of costs, including reasonable attorney fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1993 claims, and Missouri state law claims; and

e.  For such other and further relief to which plaintiff may be entitled.

12546661.2

Respectfully submitted,

BRYAN CAVE LEIGHTON PAISNER LLP


/s/ Charles A. Weiss
Charles A. Weiss, MO #20299
Stephen R. Snodgrass, MO #29017
Jonathan Potts, MO #64091
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, MO  63102-2750
Telephone:  (314) 259-2000
Facsimile:  (314) 552-8215

KHAZAELI WYRSCH, LLC

James R. Wyrsch, MO #53197
Javad Khazaeli, MO #53735
Kiara Drake, MO #67129
911 Washington Avenue, Suite 211
St. Louis, MO  63101
Telephone:  (314) 288-0777
james.wyrsch@kwlawstl.com
javad.khazaeli@kwlawstl.com
kiara.drake@kwlawstl.com

*ATTORNEYS FOR DAVID L. ROBINSON*