# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### SOUTHEASTERN DIVISION

DAVID L. ROBINSON, )
)
    Plaintiff, )
)
v. )    No. 1:19CV41 RLW
)
CITY OF SIKESTON, MISSOURI, et al., )
)
    Defendants. )

## MEMORANDUM AND ORDER

This matter is before the Court on three motions to dismiss filed separately by Defendants

John A. Blakely, the City of Sikeston, Missouri, and Charles Andrew Juden III. (ECF Nos. 49,

53, & 55 respectively) After careful consideration, the Court grants Blakely's and Juden's

motions, in part, as to the claims against them in their official capacity and denies the motions, in

part, as to the claims against them in their individual capacities. The Court also grants the City's

motion, in part, as to the request for punitive damages against it.

## BACKGROUND[1]

On the night of August 5, 2000, Sheila Box was shot in the chest and killed in Sikeston,

Missouri ("the City"). (First Am. Compl. ¶ 7 ECF No. 43) An unidentified police informant

reported that that he had "heard" Plaintiff David Robinson and Keith West were involved in the

killing. (*Id.* at ¶ 9) Based on this tip, Police Captain Charles Andrew Juden III arrested

Robinson, who is an African-American man, on the morning of August 6, 2000. (*Id.*) During

---

[1] In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences most favorably to the complainant. *U.S. ex rel. Raynor v. Nat'l Rural Utilities Co-op. Fin., Corp.*, 690 F.3d 951, 955 (8th Cir. 2012); *Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806 (8th Cir. 2008).

the arrest, Juden placed his gun on the side of Robinson's head and said, "You killed a white girl. I'm gonna f..king kill you." (*Id.* at ¶ 10) Detective John Blakely was also present during the arrest. (*Id.*) At the jail, Robinson provided officers with alibi witnesses who placed him away from the scene of the shooting from around 8:00 p.m. on August 5 until around 1:30 on August 6. (*Id.* at 10) Officers, including Juden, interviewed one alibi witness, Cory Turner, who said he was with Robinson from around 11:00 p.m. until 11:37 p.m. on August 5. (*Id.* at ¶ 12) On August 6 around noon, officers told Robinson that he was no longer being held for Box's murder; however, he remained in jail on an alleged parole violation until he was released on August 9. (*Id.* at ¶ 13)

Sometime after Box's murder, Albert Baker was arrested and jailed for felony stealing of an air conditioner. (*Id.* at ¶ 15) Baker had a long criminal history and became a police informant in June 2000. (*Id.*) An officer asked Baker whether he had any information regarding Box's murder, but he denied knowing anything. (*Id.*) On August 15, Baker informed an officer that he wanted to talk to Blakely about Box's murder. (*Id.* at ¶ 16) Blakely did not go to Baker's jail cell until around 1:00 a.m. on August 18. (*Id.*) After the interview, Baker signed a witness statement – prepared by Blakely – in which Baker claimed he witnessed Robinson shoot Box. (*Id.* at ¶ 17) Thereafter, Blakely arranged for Baker's immediate release from jail on his own recognizance. (*Id.* at ¶ 18) On the morning of Baker's release, Blakely gave him $50 in cash. (*Id.* at ¶ 19) Blakely gave Baker additional cash payments in amounts ranging between $10 and $100 on August 22, 23, and 29 and on September 2, 11, and 15. (*Id.*) Blakely later claimed those payments were made pursuant to the City's witness protection program; however, Robinson maintains that records show the payments were made because Baker was a paid police informant. (*Id.*) Blakely also arranged for Baker to live in an apartment in Perryville, Missouri,

at the expense of the City's police department before Baker eventually moved to Milwaukee, Wisconsin. (*Id.* at ¶ 20) All payments ceased after Baker moved out of Missouri. (*Id.*) Up until then, Baker had received approximately several thousand dollars at Blakely's direction. (*Id.*)

Blakely applied for, and received, a warrant to arrest Robinson for Box's murder based almost entirely on Baker's signed statement. (*Id.* at ¶¶ 26-27) Robinson alleges multiple witnesses could have provided statements that contradicted Baker's version of events. (*Id.* at ¶¶ 22, 25, 27) None of these witnesses were interviewed by police. (*Id.*) Additionally, Robinson asserts Blakely misrepresented statements from his alibi witnesses in the probable cause affidavit submitted with the warrant application. (*Id.* at ¶¶ 27-28, & 30)

Blakely arrested Robinson on August 30, 2000. (*Id.* at ¶ 29) After the arrest, Blakely obtained a statement from a prisoner in the Scott County Jail named Jason Richison. (*Id.* at ¶ 31) Richison claimed in his statement, which was also prepared by Blakely, that he had previously shared a cell with Robinson for three or four days and heard Robinson confess to Box's murder. (*Id.*) Richison repeated this allegation when he testified at Robinson's trial. (*Id.*) According to Robinson, he never shared a cell with Richison. (*Id.* at ¶ 32) This fact could have been verified by jail records and other cellmates, but neither Blakely nor Juden attempted to prove Richison's claim. (*Id.*)

Prior to Robinson's trial in 2001, the City's police department had information from the Scott County deputy sheriff that a man named Romanze Mosby was involved in Box's murder. (*Id.* at ¶ 34) Mosby and his cousin, Carlos Jones, had accused each other of shooting Box to police. (*Id.* at ¶ 35) Neither Mosby nor Jones mentioned Robinson as having any involvement. (*Id.*) Despite being aware of Mosby and Jones, Blakely did not attempt to pursue any investigation into their involvement in Box's murder. (*Id.*) Further, Blakely and other law

enforcement officials were investigating Mosby for possible involvement in at least five other shootings between August 2000 and August 2001 while Robinson was awaiting trial. (*Id.* at ¶ 36)

Before trial, a man named Ronald Coleman, who was associated with Baker, disclosed to Robinson's public defender that Baker had privately admitted to falsely accusing Robinson in exchange for preferential treatment from Blakely regarding his own criminal charges. (*Id.* at ¶¶ 38-39) Upon learning of Coleman's intention to testify at trial, Blakely called Coleman at his home and threatened to file unrelated drug charges against Coleman if he testified. (*Id.* at ¶ 39) After this conversation, Coleman did not show up for trial or respond to calls from the Public Defender's Office. (*Id.*)

Robinson's trial began on August 25, 2001. (*Id.* at ¶ 41) In a pretrial conference, the trial court sustained the prosecution's motions *in limine* to exclude testimony by and about Mosby and Jones's possible involvement in Box's murder. (*Id.* at ¶ 44) Additionally, Mosby appeared pursuant to a subpoena and testified outside the presence of the jury that Jones killed Box. (*Id.* at ¶ 45) During the trial, prosecutors did not present any physical evidence connecting him to the crime; rather, it relied on the testimony of Baker and Richison. (*Id.* at ¶ 41) Robinson's defense offered testimony from other witnesses whose accounts of events contradicted Baker's and Richison's. (*Id.* at ¶¶ 42-43)

On August 29, 2001, the jury convicted Robinson of Box's murder and he was later sentenced to life without parole. (*Id.* at ¶ 46) The day after the trial concluded, Juden – who had been promoted to Director of Public Safety for the City on April 4, 2001 (*Id.* at ¶¶ 4 & 40) – forwarded an email from Blakely with the following message announcing Robinson's conviction to the City's mayor, city council, and all police officers:

> I wish to thank all of you for the GREAT work on this case. David Robinson has
> been a violent criminal since the young age of 14 and was one of the most dangerous
> criminals in our community. Once again we have proven what a great team we
> have and that we can make a difference.

(*Id.* at ¶ 48)

Robinson filed a post-conviction motion to vacate his conviction. (*Id.* at ¶ 49) Peron "Butch" Johnson, an investigator for the Public Defender's Office, interviewed Mosby in prison and secured an audio recording of Mosby confessing to the murder. (*Id.* at ¶ 50) According to Mosby, Box drove up to him and asked if he had drugs to sell. (*Id.*) Before the transaction took place, Mosby saw a flash that he thought was a gun and shot Box. (*Id.*) Box managed to drive away before eventually crashing and succumbing to her injuries. (*Id.*) Johnson also interviewed Jones, who corroborated Mosby's account. (*Id.* at ¶ 52)

Johnson then contacted Baker. (*Id.* at ¶ 53) Baker admitted he had not witnessed Box's shooting and he falsely accused Robinson to get himself out of jail. (*Id.*) Baker declined to make a recorded statement at the time. (*Id.*) Nevertheless, Johnson obtained and served a subpoena on Baker to testify at the post-conviction relief hearing. (*Id.*) At some point prior to the hearing, Blakely learned of Baker's intention to recant his accusation. (*Id.* at ¶ 55) Blakely directed a uniformed officer in Park Hills, Missouri, to locate Baker. (*Id.*) While Baker was walking down a street, the officer drove up and handed him a telephone. (*Id.*) Blakely was on the other end and told Baker, "We are watching you." (*Id.*) Thereafter, Baker stopped responding to Johnson's multiple attempts at contact. (*Id.* at ¶ 57) Johnson sent a letter to Baker, stating "You did wrong at the original trial, don't do it again." (*Id.*) Baker shared the letter with the prosecutor, who then presented it to opposing counsel and the post-conviction judge. (*Id.* at ¶ 58) The judge scolded Johnson, and Robinson's post-conviction counsel chose not to call Johnson to testify that Baker had recanted his trial testimony. (*Id.*)

At the post-conviction hearing, Baker reverted to his trial testimony and accused Robinson of murdering Box. (*Id.*) Both Coleman and Richison testified in depositions in support of Robinson. (*Id.* at ¶¶ 60-63) Three additional witnesses testified in support of theory that Mosby was the shooter. (*Id.* at ¶¶ 64-66) The court, nonetheless, denied Robinson's motion for post-conviction relief. (*Id.* at ¶ 67)

Robinson obtained new counsel through a legal clinic and filed a habeas corpus petition in the Cole County Circuit Court. (*Id.* at ¶ 73) His new counsel obtained a video-recorded interview with Baker in 2012 while he was in prison in which he again recanted his trial testimony accusing Robinson of Box's murder. (*Id.* at ¶ 74) At his deposition in May 2015, Baker stated under oath that he falsely accused Robinson because he was receiving money and housing from the state and feared retaliation from Blakely. (*Id.*)

Robinson's counsel also deposed Kelvin Howard, Mosby's stepfather. (*Id.* at ¶ 75) Howard testified that he was in prison with Mosby on June 9, 2009. (*Id.*) While in the prison library, Howard and Mosby saw a newspaper article about Robinson's efforts to overturn his conviction that included Mosby's confession. (*Id.*) Later, Mosby confessed to Howard that he had shot the woman Robinson was convicted of murdering. (*Id.*) Mosby, with only two months remaining on his sentence, feared he would be forced to testify and convicted of the murder. (*Id.*) That night, Mosby hanged himself in his cell. (*Id.*)

An evidentiary hearing on Robinson's habeas corpus petition was conducted in May 2015. (*Id.* at ¶ 76) During the hearing, Robinson presented the new depositions of Baker and Howard as well as the deposition of Richison taken for the post-conviction relief hearing. (*Id.*) Robinson also submitted statements from several of Mosby's fellow inmates at South Central

Correctional Center who asserted Mosby had confessed to shooting Box. (*Id.* at ¶¶ 68-72, 78) Robinson himself testified at the hearing along with Johnson. (*Id.* at ¶¶ 79-80)

The habeas court denied Robinson's petition, finding that his witnesses were not credible. (*Id.* at ¶ 81) Robinson then filed a habeas corpus petition in the Missouri Court of Appeals, Western District, which was also denied. (*Id.*)

Robinson next filed a habeas petition in the Supreme Court of Missouri, which granted a preliminary writ of habeas corpus and appointed a special master to hear evidence. (*Id.* at ¶ 83) At the evidentiary hearing before the special master, sixteen witnesses appeared and testified live or by video conference. (*Id.* at ¶ 84) These witnesses included Baker, Howard, Johnson, Jones, Richison, and Robinson himself. (*Id.*) The state presented testimony from the prosecutor in Robinson's case and Blakely. (*Id.*)

The special master found that Robinson was innocent of Box's murder and issued a ninety-two-page report detailing his findings. (*Id.* at ¶ 85) On May 1, 2018, the Supreme Court of Missouri concluded that Robinson met the burden of proof necessary to establish a "gateway" claim of innocence in light of the constitutional violations that occurred during his trial, he was entitled to habeas corpus relief. (*Id.* at ¶ 86) The state decided not to retry Robinson, and he left prison on May 14, 2018. (*Id.*)

Robinson has now filed this action against Blakely, Juden, and the City (collectively referred to as "Defendants"). In his First Amended Compliant, Robinson asserts claims under federal and Missouri law. Counts I through IV, each brought pursuant to 42 U.S.C. § 1983, allege Defendants violated Robinson's constitutional rights: Counts I and II assert claims for wrongful conviction against Defendants Blakely and Juden, as individuals and in their official capacity, and against the City, respectively; Count III asserts Defendants Blakely and Juden, as

individuals and in their official capacity, violated Robinson's First and Fourth Amendment rights of access to courts; and Count IV asserts liability against the City for Robinson's continued incarceration. Counts V through VIII assert claims under Missouri law against Defendants Blakely and Juden, as individuals and as employees of the City: Count V asserts a claim for malicious prosecution; Count VI asserts a claim for intentional infliction of emotional distress; Count VII asserts a claim for negligent infliction of emotional distress; and Count VIII asserts a claim for false imprisonment.

Each Defendant has moved separately under Federal Rule of Civil Procedure 12(b)(6) to dismiss Robinson's claims against them. (ECF Nos. 49, 53, & 55) Robinson opposes the motions.

## LEGAL STANDARD

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted if the complaint fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* at 555. Courts must liberally construe the complaint in the light most favorable to the plaintiff and accept the factual allegations as true. *See Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008) (stating that in a motion to dismiss, courts accept as true all factual allegations in the complaint); *Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806 (8th Cir. 2008) (explaining that courts should liberally construe the complaint in the light most favorable to the plaintiff).

However, "[w]here the allegations show on the face of the complaint there is some insuperable bar to relief, dismissal under Rule 12(b)(6) is appropriate." *Benton v. Merrill Lynch*

& Co., 524 F.3d 866, 870 (8th Cir. 2008) (citation omitted). Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). When considering a motion to dismiss, a court can "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. Legal conclusions must be supported by factual allegations to survive a motion to dismiss. *Id.*

## DISCUSSION

### I.  Robinson's federal claims

42 U.S.C. § 1983 was designed to provide a "broad remedy for violations of federally protected civil rights." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 685 (1978). Section 1983 provides no substantive rights; it merely provides a remedy for violations of all "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." 42 U.S.C. § 1983; *see also Albright v. Oliver*, 510 U.S. 266, 271 (1994) (section 1983 "merely provides a method for vindicating federal rights elsewhere conferred"). To state a claim under § 1983, a plaintiff must establish: (1) the violation of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation of that right was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

### *(a)  Official capacity claims*

Both Blakely and Juden argue the claims against them in their official capacity should be dismissed as redundant to the claims against the City. Courts have recognized that a § 1983 claim against a state officer in his or her official capacity is functionally equivalent to a claim against the employing governmental entity and, accordingly, must be dismissed as redundant to the claims asserted against the government entity. *See, e.g., Veatch v. Bartels Lutheran Home*,

627 F.3d 1254, 1257 (8th Cir. 2010) (affirming the dismissal of § 1983 claims against public

officials in their official capacities as redundant to § 1983 claims made against the governmental

entity). Consquently, the Court grants Juden's and Blakely's motions, in part, as to the claims

against them in their official capacity.

### *(b) Federal claims against Blakely*

As an initial matter, Blakely argues Robinson's federal claims are barred by the statute of

limitations. They are not.

> [I]n order to recover damages for allegedly unconstitutional conviction or
> imprisonment, or for other harm caused by actions whose unlawfulness would
> render a conviction or sentence invalid, a § 1983 plaintiff must prove that the
> conviction or sentence has been reversed on direct appeal, expunged by executive
> order, declared invalid by a state tribunal authorized to make such determination, or
> called into question by a federal court's issuance of a writ of habeas corpus, 28
> U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or
> sentence that has *not* been so invalidated is not cognizable under § 1983.

*Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994) (footnote omitted). Accordingly, "a § 1983

cause of action for damages attributable to an unconstitutional conviction or sentence does not

accrue until the conviction or sentence has been invalidated." *Id.* at 489–90. The Supreme

Court has clarified that the same rationale applies to § 1983 claims based on fabrication of

evidence. *McDonough v. Smith*, 139 S. Ct. 2149, 2154–55 (2019) ("The statute of limitations

for a fabricated-evidence claim . . . does not begin to run until the criminal proceedings against

the defendant (*i.e.*, the § 1983 plaintiff) have terminated in his favor."). The Supreme Court of

Missouri set aside Robinson's convictions in May 2018, and he filed this lawsuit less than a year

later in March 2019. Accordingly, his claims under § 1983 are well within Missouri's five-year

statute of limitations. Mo. Rev. Stat. § 516.120(4); *Wilson v. Garcia*, 471 U.S. 261, 276 (1985)

(holding that § 1983 claims are subject to the forum state's personal injury statute of

limitations), *superseded by statute on other grounds by* 28 U.S.C. § 1658(a) *as recognized in Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 377–81 (2004)).

There is no question that Blakely was acting under color of state law during the relevant time period and events of this case. *See West*, 487 U.S. at 48. He was a detective working for a municipal police department and pursuing a criminal investigation. *See Magee v. Trustees of Hamline Univ., Minn.*, 747 F.3d 532, 535 (8th Cir. 2014) (quoting *Roe v. Humke*, 128 F.3d 1213, 1216 (8th Cir. 1997)) ("[W]hether a police officer is acting under color of state law turns on the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."). The Court must, therefore, determine whether Robinson has plausibly alleged Blakely violated a right secured by the Constitution or law of the United States. *Id.*

Blakely argues Robinson's § 1983 claims against him in his individual capacity are barred because he is entitled to qualified immunity. According to Blakely, it was not clearly established at the time of Robinson's arrest and conviction that the actions Blakely is alleged to have committed constituted violations of a person's constitutional rights.

"Qualified immunity protects governmental officials from liability for civil damages if they have not violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Akins v. Epperly*, 588 F.3d 1178, 1183 (8th Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The qualified immunity doctrine provides "protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). It "allows officers to make reasonable errors." *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996). Officers are allowed considerable room for "mistaken judgments." *Borgman v. Kedley*, 646 F.3d 518, 522 (8th Cir. 2011). "To defeat

qualified immunity, the plaintiff has the burden to prove: '(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation.'" *Wilson v. Lamp*, 901 F.3d 981, 986 (8th Cir. 2018) (quoting *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009)).

At this stage of the litigation and viewing the allegations in the light most favorable to Robinson, the Court denies Blakely's motion to dismiss based upon qualified immunity. In Count I, Robinson asserts Blakely violated clearly established rights guaranteed by the Fourteenth Amendment by allegedly manufacturing evidence, suborning perjured testimony at trial, and threatening witnesses he did not want to testify. While neither party presents case law directly on point, Robinson argues his allegations are similar to cases asserting *Brady* violations. *See generally Wilson v. Lawrence Cty.*, 260 F.3d 946, 951 (8th Cir. 2001) ("To be clearly established, there need not be a case decided on all fours with the present factual circumstances. Rather, it need only be apparent from pre-existing law that the conduct is unlawful.") (citations omitted). As the Supreme Court held in *Brady v. Maryland*, "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). *Brady's* protections extend to actions of prosecutors as well as other law enforcement officers. *White v. McKinley*, 519 F.3d 806, 813–14 (8th Cir. 2008). "However, an investigating officer's failure to preserve evidence potentially useful to the accused or their failure to disclose such evidence does not constitute a denial of due process in the absence of bad faith." *Id.* at 814. "[T]he recovery of § 1983 damages requires proof that a law enforcement officer other than the prosecutor intended to deprive the defendant of a fair

- 12 -

trial." *Villasana v. Wilhoit*, 368 F.3d 976, 980 (8th Cir. 2004). Robinson's allegations against

Blakely unambiguously suggest, at a minimum, Blakely intended to deprive Robinson of a fair

trial. Consequently, the Court finds Robinson has stated a claim for relief against Blakely in

Count I.

The Court also finds Robinson has stated a claim against Blakely in Count III. In this

count, Robinson alleges Blakely violated his rights of access to the courts under the First and

Fourth Amendments by hindering his ability to pursue claims to exonerate himself and secure his

release from incarceration. Another judge of this district summarized Supreme Court and Eighth

Circuit precedent on access-to-the-courts claims in *Cobb v. Madlock*, No. 1:19-CV-61-SNLJ,

2019 WL 2617407, at *4 (E.D. Mo. June 25, 2019).

> To have standing to bring a § 1983 claim premised on the right of access to the
> courts, a prisoner must have suffered an "actual injury" to a pending case. *Lewis v.
> Casey*, 518 U.S. 343, 351-52 (1996); *see also Sabers v. Delano*, 100 F.3d 82, 84
> (8th Cir. 1996) (per curiam) (concluding that, because the plaintiff suffered no
> cognizable injury, she lacked standing to bring an access-to-courts claim). "Actual
> injury" means "that a nonfrivolous legal claim had been frustrated or was being
> impeded" by the alleged wrongful conduct. *Lewis*, 518 U.S. at 352-53; *see also
> Moore v. Plaster*, 266 F.3d 928, 933 [(8th Cir. 2001)] (quoting *Johnson v. Missouri*,
> 142 F.3d 1087, 1089 (8th Cir. 1998)). It is insufficient to merely allege that
> wrongful conduct occurred, even if it is systemic. *Sabers*, 100 F.3d at 84 (citing
> *Lewis*, 518 U.S. 343). Instead, the plaintiff must plead, and ultimately prove, that
> the wrongful conduct deprived him of some specific opportunity to defend himself,
> or advance a nonfrivolous legal claim, in a criminal appeal, postconviction matter,
> or civil rights action seeking to vindicate constitutional rights. *Id.* Speculation that
> injury might occur or could have occurred is insufficient. *See Hartsfield v. Nichols*,
> 511 F.3d 826, 833 (8th Cir. 2008) ("[a]bsent an articulation of how the alleged
> wrongful conduct actually blocked [the prisoner's] access to filing a complaint, or
> caused a filed complaint to be deficient, [the prisoner's] alleged injuries are merely
> speculative").

*Id.* Here, Robinson argues Blakely had a continuing obligation to come forward and demonstrate

how his alleged misconduct contributed to Robinson's wrongful conviction. Additionally,

Robinson has alleged Blakely negatively impacted his post-conviction hearing by intimidating

Baker into reverting to his testimony from the trial after recanting. These allegations, taken as true, clearly impeded Robinson's effort to pursue postconviction relief and resulted in the concrete injury of his more than seventeen-year incarceration. Consequently, the Court denies Blakely's motion to dismiss as to Count III.

### (c) Federal claims against Juden

Juden also moves to dismiss Counts I and III against him in his individual capacity. He first argues the only factual allegations directed at him relate to Robinson's initial arrest the morning after the shooting on August 6, 2000. Because Robinson was released from jail a few days later on August 9, Juden contends the § 1983 claims against him are barred by Missouri's five-year statute of limitations. *See* Mo. Rev. Stat. § 516.120(4); *Wilson*, 471 U.S. at 276. Beyond the initial arrest, Juden argues Robinson has failed to state a claim against him under § 1983 because the First Amended Complaint lacks factual allegations establishing Juden's personal involvement in the investigation.

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, *through the official's own individual actions*, has violated the Constitution." *Marsh v. Phelps Cty.*, 902 F.3d 745, 754 (8th Cir. 2018) (emphasis added) (quoting *Iqbal*, 556 U.S. at 676). A plaintiff "must allege specific facts of [the supervisory Government-official's] personal involvement in, or direct responsibility for, a deprivation of [his or her] constitutional rights." *Id.* (quoting *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006)). Specifically, claims related to a supervisor's alleged "failure to train an inferior [official] may subject the supervisor to liability in his individual capacity only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [inferior officials]

come into contact." *Id.* (internal quotation marks omitted) (quoting *Schaffer v. Beringer*, 842 F.3d 585, 596 (8th Cir. 2016)).

As explained above, Robinson's allegations in this case are similar to cases asserting *Brady* violations that can result in liability if an officer intended to deprive a criminal defendant of a fair trial. *See Villasana*, 368 F.3d at 980. Additionally, the Eighth Circuit has held that officials may be liable under § 1983 for intentional or reckless failure to investigate another suspect. *Wilson*, 260 F.3d at 957. Here, Robinson alleges Juden was actively involved in or at least aware of the *series* of misconduct that caused him to be wrongfully convicted. Juden's alleged threat to Robinson during the initial arrest creates a reasonable inference that racial animus was present during the investigation into the shooting of Box. Juden also participated in the interview of one of Robinson's alibi witnesses. Further, Juden's email congratulating the police department after Robinson's conviction indicates Juden had a pre-existing opinion of Robinson that might have unfairly tainted the investigation.

Beyond these assertions directly concerning Juden's conduct, Robinson argues reasonable inferences can be drawn that Juden would have been personally involved with the entire investigation of Box's shooting. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556) ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."). The viability of the claims against Juden largely turns on whether he had actual or constructive notice of and was deliberately indifferent to or authorized the asserted violations principally conducted by Blakely. *See Marsh*, 902 F.3d 754. During the course of the investigation, Juden was a police captain until he was promoted to

the position of Director of Public Safety on April 4, 2001. Robinson alleges that Juden, in both roles, was responsible for the day-to-day operations of the City's police department, which served a community of approximately 17,000 people.[2] The Court finds that it is reasonable to infer that Juden would have taken a keen personal interest in the murder investigation given his roles and his known personal involvement in the initial steps of the investigation.[3]

At this early stage in the litigation, Robinson has alleged sufficient facts on which reasonable inferences can be drawn that Juden intentionally or recklessly failed to fully investigate Box's shooting and that Juden was personally involved in or deliberately indifferent to police misconduct that resulted in Robinson's wrongful conviction. Accordingly, the Court denies Juden's motion to dismiss as to Counts I and III.

### (d) Federal claims against the City

As explained above, Counts I and III against Blakely and Juden in their official capacity are treated as against the City. *See Veatch*, 627 F.3d at 1257. Counts II and IV, on the other hand, assert claims for municipal liability against the City directly under § 1983 for Robinson's wrongful conviction and continued incarceration, respectively. The City argues Robinson has

---

[2] According to the 2000 United States Census, Sikeston had 16,992 inhabitants around the time of Box's shooting. Census 2000 Data for the State of Missouri, United States Census Bureau, https://www.census.gov/census2000/states/hs~mo.html (follow "State by Place" hyperlink; then scroll to find "Sikeston city, Missouri").

[3] Robinson repeatedly refers to Juden as the "de facto chief of police" throughout his Memorandum in Opposition to Juden's Motion to Dismiss. (ECF No. 66) Juden disagrees with this characterization and notes the Amended Complaint does not use this exact language. (ECF No. 71, at 2) Importantly, Juden does not contest the assertion that he was responsible for the day-to-day operations of the City's police. Rather, he argues such a role does not automatically make him liable for constitutional violations of every subordinate officer. As explained in this Memorandum and Order, the Court finds that Robinson has pleaded sufficient allegations to state a claim for § 1983 liability to survive Juden's motion to dismiss.

failed to state a claim for liability under any theory because he has not alleged any municipal custom or policy of constitutional violations.

"In an action under § 1983, a municipality . . . cannot be liable on a respondeat superior theory, but can be held liable if a constitutional violation resulted from a municipal policy or custom." *A.H. v. St. Louis Cty., Mo.*, 891 F.3d 721, 728 (8th Cir. 2018). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989). Therefore, municipal liability will apply in two situations: "where a municipal policy is itself unconstitutional, and where the municipality's deliberate indifference to the need to train and supervise its employees causes an employee to violate a third party's constitutional rights." *A.H.*, 891 F.3d at 728. "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *S.M. v. Lincoln Cty.*, 874 F.3d 581, 585 (8th Cir. 2017) (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)).

The City argues the First Amended Complaint is void of any allegations purporting to demonstrate the existence of an official policy or examples of similar constitutional violations to support a finding of an unofficial custom. Robinson concedes this point and notes he is pleading under a different theory of *Monell* liability. "Municipal liability 'may be imposed for a single decision by municipal policymakers' who possess 'final authority to establish municipal policy with respect to the action ordered.'" *Hamilton v. City of Hayti, Mo.*, No. 18-3450, slip op. at 10 (8th Cir. Jan. 28, 2020) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986) (plurality opinion)). Robinson alleges that Juden, as Director of Public Safety, had the

responsibility and final authority for establishing policies related to law enforcement for the City.

Therefore, Counts I and III against Juden support Count II and IV against the City.

The City responds by arguing Juden cannot be considered a final policymaker as a matter

of law. Sikeston City Code § 130.180 provides, in relevant part:

> Such Public Safety Officers[, which include police officers and firefighters,] shall
> perform such duties and responsibilities as shall be conferred upon them from time
> to time by the Director of Public Safety of the City; provided that in addition
> thereto, such Public Safety Officers shall have and perform such duties as are
> imposed upon Policemen and firemen by the Municipal Code of the City or other
> ordinances of this City or by law.

The City is a third class city incorporated pursuant to Missouri's Constitution and statutes. (First

Am. Compl. ¶ 2, ECF No. 43)  Under the relevant statute governing third class cities, ordinances

may be enacted only after a final vote in favor by a majority of elected city council members.

Mo. Rev. Stat. § 77.080. Accordingly, the City argues that the city council, rather than Director

of Public Safety, is the final policymaker.

Robinson agues that while Missouri's statutes and the City's municipal code authorize

the city counsel to create the substantive local laws that police officers enforce, the city counsel

does not govern the *manner* in which that law is enforced. Sikeston City Code § 130.190, which

establishes the office of Director of Public Safety, defines the position as follows:

> The Director of Public Safety shall be the Chief of Police and the Chief of the Fire
> Department and shall exercise and have all of the duties of the Chief of Police and
> Chief of the Fire Department as such may be imposed or authorized by ordinance
> or by law. The term and office of both the Chief of Police and the Chief of the Fire
> Department, as used in any law or ordinance of this City, shall mean the Director
> of Public Safety. *The Director of Public Safety is authorized to make and*
> *implement rules and regulations in accordance and compliance with the laws and*
> *ordinances governing the Police Department and the Fire Department of this City,*
> *to provide for the cross-training, mutual cooperation, integration and*
> *consolidation of the Police Department and the Fire Department, all to implement*
> *the purposes of this Article.* The Director of Public Safety shall be selected and
> appointed by and serve at the pleasure of the City Manager.

(Emphasis added). Robinson, thus, argues that Juden had the authority to implement policies governing the City's law enforcement practices.

The Court finds that the issue of whether Juden should be considered a final policymaker for the City is not properly before the Court in a motion to dismiss. It is clear that the question is one of law for courts to decide. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) ("[T]he identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury."). However, the City cites to cases that were decided on motions for summary judgment with the aid of discovery. For example, the Eighth Circuit in *Atkinson v. City of Mountain View, Missouri* affirmed a district court's grant of summary judgment in favor of a fourth class city for alleged misconduct by its chief of police. 709 F.3d 1201, 1215–16 (8th Cir. 2013). The Eighth Circuit held that, "as a matter of Missouri positive law, [the chief of police] was not a 'final policymaker' for the [fourth class] city." *Id.* at 1215 (citing *Copeland v. Locke*, 613 F.3d 875, 882 (8th Cir. 2010) (affirming a district court's grant of summary judgment on similar grounds)). Additionally, the Eighth Circuit noted the plaintiff's argument that "the [fourth class] city had a custom of delegating final policymaking power to [the police chief] is *unsupported by any evidence in the record.*" *Id.* (emphasis added).

Here, the record has not been developed to know whether the city counsel delegated final policymaking to Juden. The Court also notes that *Copeland* and *Atkinson* concerned fourth class cities and not third class cities like Sikeston. This difference may not ultimately be significant for the final resolution of this case as the statutory structures seem similar; however, the Court does not decide the issue now. At this stage of the litigation, the Court finds Robinson has

alleged sufficient facts to plausibly state claims against the City under applicable § 1983 precedent. Accordingly, the City's motion to dismiss is denied as to the federal claims.

## II. Robinson's state law claims

### *(a) Sovereign immunity*

Robinson's state law claims in Counts V through VIII are asserted against Blakely and Juden "Individually and as Employees of the City of Sikeston." Defendants argue these claims are barred by the doctrine of sovereign immunity. Robinson, however, contends the City has waived sovereign immunity in this matter. "Suits to recover damages pursuant to [the sovereign immunity] waiver are brought under the doctrine of *respondeat superior*." *Milson v. Shepard*, No. 4:06-CV-797CEJ, 2007 WL 710177, at *7 (E.D. Mo. Mar. 6, 2007) (quoting *Davis-Bey v. Mo. Dep't of Corr.*, 944 S.W .2d 294, 298 n.5 (Mo. Ct. App. 1997)). "Under that doctrine, an employer is responsible for the negligent acts of its employees, provided those acts are within the scope of the employee's duties." *Id.*

"Under Mo. Rev. Stat. § 537.600, public entities enjoy sovereign immunity . . . unless immunity is waived, abrogated, or modified by statute." *Richardson v. City of St. Louis*, 293 S.W.3d 133, 136 (Mo. Ct. App. 2009) (citation omitted). "A municipality has sovereign immunity from actions at common law tort in all but four cases." *Bennartz v. City of Columbia*, 300 S.W.3d 251, 259 (Mo. Ct. App. 2009). These four exceptions include:

(1) where a plaintiff's injury arises from a public employee's negligent operation of a motor vehicle in the course of his employment ([Mo. Rev. Stat. ]section 537.600.1(1)); (2) where the injury is caused by the dangerous condition of the municipality's property ([Mo. Rev. Stat. ]section 537.600.1(2)); (3) where the injury is caused by the municipality performing a proprietary function as opposed to a governmental function (*State ex rel Board of Trustees of the City of North Kansas City Memorial Hospital*, 843 S.W.2d 353, 358 (Mo. banc 1993)); and (4) to the extent the municipality has procured insurance, thereby waiving sovereign immunity up to but not beyond the policy limit and only for acts covered by the policy ([Mo. Rev. Stat. ]section 537.610).

*Id.* at 259. "When bringing claims against a public entity, a plaintiff 'bears the burden of pleading with specificity facts giving rise to an exception to the rule of sovereign immunity[.]'" *Wann v. St. Francois Cty., Mo.*, No. 4:15CV895 CDP, 2016 WL 866089, at *7 (E.D. Mo. Mar. 7, 2016) (quoting *Richardson*, 293 S.W.3d at 136–37).

Defendants argue Robinson has failed to sufficiently plead any waiver of sovereign immunity. Specifically, Defendants contend Robinson's assertion that the City has purchased "a policy or policies of insurance that are applicable to police misconduct" does not meet the pleading standard under *Iqbal*. The Court disagrees. While Robinson has alleged the City may have secured multiple insurance policies that could be applicable to this matter, he has identified one specific policy and its provider. Quoted more fully, the First Amended Complaint contains the following allegation:

> The City of Sikeston purchased and possessed insurance coverage that insured the City of Sikeston and its officials and employees against the claims alleged by Plaintiff, including but not limited to insurance coverage provided by Travelers Indemnity Company, The Travelers Indemnity Company of Connecticut; the Travelers Indemnity Company of America, the Charter Oak Fire Insurance Company and St. Paul Fire and Marine Insurance Company. Therefore, the City of Sikeston has waived sovereign immunity by purchasing a policy or policies of insurance that are applicable to police misconduct.

(First Am. Compl. ¶ 138, ECF No. 43) (citing Mo. Rev. Stat. § 537.610). In fact, those insurers have filed a declaratory action related to the facts of this exact case. Am. Compl. for Declaratory J., *The Travelers Indem. Co., et al. v. City of Sikeston, Mo., et al.*, No. 1:19-CV-0070-AGF (E.D. Mo. July 22, 2019). That case remains pending before another judge in this district.

While the ultimate interpretation and applicability of the relevant insurance terms may impact the claims and defenses at issue in this case, it is not necessary for the Court to reach that conclusion in a motion to dismiss. Based on the face of the First Amended Complaint, Robinson

has plausibly alleged the City has acquired insurance coverage for claims such as his to overcome the City's sovereign immunity defense.

### (b) Claim for malicious prosecution

Juden additionally argues Count V should be dismissed because Robinson has failed to state a claim against him for malicious prosecution under Missouri law. Juden contends there is no factual allegation suggesting he was personally responsible for instigating the prosecution against Robinson or that he was motivated by malice.

In reality, Robinson has alleged Juden exhibited racial animus and acted along with Blakely to fabricate inculpatory evidence and hide exculpatory evidence. The Court finds that, at this stage of the litigation, Robinson has alleged sufficient facts to support a claim for malicious prosecution.

### (c) Claims for intentional and negligent infliction of emotional distress

Defendants argue Robinson's claims for intentional and negligent infliction of emotional distress (Counts VI and VII, respectively) are time-barred. Additionally, they argue Robinson has failed to state a claim independent from a traditional tort. *See K.G. v. R.T.R.*, 918 S.W.2d 795, 799 (Mo. 1996) (en banc) ("[W]here [a defendant's] conduct amounts to the commission of one of the traditional torts, such as battery, and the conduct was not intended only to cause extreme emotional distress to the victim, the tort of intentional emotional distress will not lie, and recovery must be had under the appropriate traditional common-law action.").

"The statute of limitations for emotional distress claims is five years." *State ex rel. Halsey v. Phillips*, 576 S.W.3d 177, 182 (Mo. 2019) (en banc) (citing Mo. Rev. Stat. § 516.120(4)). The Supreme Court of Missouri has held that "the statute of limitations begins to run when the 'evidence was such to place a reasonably prudent person on notice of a potentially

- 22 -

actionable injury.'" *Powel v. Chaminade Coll. Preparatory, Inc.*, 197 S.W.3d 576, 582 (Mo.

2006) (en banc) (emphasis omitted) (quoting *Bus. Men's Assur. Co. of Am. v. Graham*, 984

S.W.2d 501, 507 (Mo. 1999) (en banc)).

The Court finds that Robinsons emotional distress claims are not time-barred because he

objectively would not have been on notice that he had an actionable claim until his innocence

was declared and his conviction was set aside in May 2018. Furthermore, Robinson's alleged

emotional injuries continued throughout his more than seventeen-year incarceration. Robinson

alleges Defendants caused him to "suffer[] emotional distress from mental injury as is medically

diagnosable and sufficiently severe to be medically significant." (First Am. Compl. ¶ 154, ECF

No. 43) Specifically, he alleges his injuries and damages include:

counting the time he was awaiting trial in jail, more than 17 years of incarceration
and the attendant humiliation, loss of freedom, companionship, family, educational
opportunity and income, damage to his personal reputation, the infliction of mental
and physical harm, pain and suffering, the fear of bodily harm and death, and the
anguish and despair caused by being incarcerated with a life-without-parole
sentence for a crime he did not commit.

(*Id.* at ¶ 117) The Court also concludes that a jury could reasonably find the facts alleged in the

First Amended Complaint are "so outrageous in character, and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in

a civilized community." *Halsey*, 576 S.W.3d at 181 (quoting *Gibson v. Brewer*, 952 S.W.2d

239, 249 (Mo. 1997) (en banc)). Accordingly, Robinson's claims of emotional distress are

independent from traditional common law torts.

### *(d) Claim for false imprisonment*

Blakely argues Count VIII for false imprisonment is time-barred. However, Blakely

bases this argument solely on Robinson's initial arrest on August 6, 2000, for which he was

released on August 9. In reality, Count VIII is based on Robinson's seventeen-year period of

incarceration. The statute of limitations for a false imprisonment case "accrues on the discharge from imprisonment." *Stafford v. Muster*, 582 S.W.2d 670, 680 (Mo. 1979) (en banc). Because Robinson was not released from prison until May 2018, he was not time-barred when he filed this lawsuit less than a year later in March 2019.

### *(e) Claims for attorneys' fees, prejudgment interest, and punitive damages*

Defendants argue the Court should dismiss Robinson's requests for attorneys' fees regarding his state law claims.[4] "In considering a request for attorney's fees, Missouri has adopted the American Rule; that is, absent statutory authorization or contractual agreement, with few exceptions, each litigant must bear his own attorney's fee." *Trs. of Clayton Terrace Subdivision v. 6 Clayton Terrace, LLC*, 585 S.W.3d 269, 285 (Mo. 2019) (en banc) (quoting *Incline Village Bd. of Trs. v. Edler*, — S.W.3d —, 2019 WL 1912218 (Mo. Apr. 30, 2019) (en banc)).

Robinson argues Missouri case law provides certain "special circumstances" can constitute such an exception. "Although Missouri courts narrowly construe what constitutes a special circumstance for the purpose of awarding attorney's fees, *intentional misconduct* is a special circumstance that may justify an award of attorney's fees." *Incline Vill. Bd. of Trs.*, 2019 WL 1912218, at *6 (emphasis added) (internal quotation marks omitted) (quoting *Tupper v. City of St. Louis*, 468 S.W.3d 360, 374 (Mo. 2015) (en banc)); *see also Windsor Ins. Co. v. Lucas*, 24 S.W.3d 151, 156 (Mo. Ct. App. 2000) (noting special circumstances justifying an award of attorneys' fees can include "rare," "special," or "very unusual" circumstances, including "intentional misconduct by a party"). Because Robinson has pleaded, and a jury could ultimately

---

[4] The Court has the discretion under 42 U.S.C. § 1988(b) to award reasonable attorneys' fees to prevailing plaintiffs on § 1983 claims.

find, the existence of intentional misconduct, Robinson argues his claim for attorneys' fees should not be dismissed at this stage.

The Supreme Court of Missouri has recently questioned lower court opinions on this issue. Over the past few decades, numerous opinions from the Missouri Court of Appeals have applied the "intentional misconduct" exception to the general American Rule on attorneys' fees in a variety of contexts. *See, e.g.*, *Barr v. Mo. State Dep't of Soc. Servs.*, 565 S.W.3d 683, 691 (Mo. Ct. App. 2018) (affirming an award of attorneys' fees in a child abuse registry case because "[g]iven . . . unchallenged findings regarding the Children's Division's conduct in this case, we cannot conclude that unusual or special circumstances were not present in this case justifying an award of attorney's fees"); *St. Louis Title, LLC v. Talent Plus Consultants, LLC*, 414 S.W.3d 24, 26 (Mo. Ct. App. 2013) (recognizing "special circumstances" exception in a breach of contract case). The Supreme Court of Missouri, however, has not "allow[ed] a finding of 'special circumstances' based on intentional misconduct *outside the declaratory judgment context*." *Trs. of Clayton Terrace Subdivision*, 585 S.W.3d at 286.

The Supreme Court of Missouri ultimately did not need to decide the issue to reach its holding in *Trustees of Clayton Terrace Subdivision*. *Id.* ("This Court need not determine whether these appellate courts erred in extending the declaratory judgment exception to similar cases. Assuming, without deciding, that such a limited additional exception exists for intentional misconduct that is fraudulent, groundless or based solely on spite, this is not such a case."). Despite the apparent uncertainty at the Supreme Court of Missouri regarding attorneys' fees in non-declaratory actions, the Court finds that sufficient appellate authority exists for Robinson's claim for attorneys' fees to survive a motion to dismiss.

Blakely also argues Robinson's request for prejudgment on his state claims should be dismissed because the First Amended Complaint does not allege any of the preconditions contained

in Mo. Rev. Stat. § 408.040.3. The Court finds this argument is premature. Blakely has not cited to a single case suggesting such a claim can properly be dismissed in a Rule 12(b)(6) motion.

Defendants also argue Robinson's request for punitive damages against Blakely and Juden in their official capacities should be dismissed due to immunity. Robinson acknowledges he is not entitled to punitive damages against the City for either his federal or state claims. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) (holding that municipalities have absolute immunity from punitive damages in § 1983 claims); *see also* Mo. Rev. Stat. § 537.610.3 ("No award for damages on any claim against a public entity within the scope of sections 537.600 to 537.650, shall include punitive or exemplary damages."). Accordingly, the Court will grant the City's motion, in part, as to the request for punitive damages against it. Robinson, however, may pursue his claim for punitive damages against Blakely and Juden in their individual capacities. *See Smith v. Wade*, 461 U.S. 30, 56 (1983) (holding that "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.").

Accordingly,

**IT IS HEREBY ORDERED** that Defendant John A. Blakely's Motion to Partially Dismiss Plaintiff's First Amended Complaint (ECF No. 49) is **GRANTED, in part,** as to the claims against him in his official capacity, **and DENIED, in part,** as to the claims against him in his individual capacity.

**IT IS FURTHER ORDERED** that Defendant City of Sikeston's Motion to Dismiss (ECF No. 53) is **GRANTED, in part,** as to the request for punitive damages against the City, **and DENIED, in part,** as to the remainder of the claims.

**IT IS FINALLY ORDERED** that Defendant Charles Andrew Juden III's Motion to Dismiss Plaintiff's First Amended Complaint for Failure to State a Cause of Action (ECF No. 55) is **GRANTED, in part,** as to the claims against him in his official capacity, **and DENIED, in part,** as to the claims against him in his individual capacity.

Defendants are reminded of their obligation to answer or otherwise respond to the First Amended Complaint (ECF No. 43) within the time set by the rules.

Dated this 6th day of February, 2020.

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**